# United States Court of Appeals
## For the First Circuit

No. 00-1104

UNITED STATES OF AMERICA,

Appellee,

v.

ANDRES CAMPA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin and Bownes, Senior Circuit Judges.

Owen S. Walker, Federal Public Defender, with whom Stephanie
A. Jirard, Federal Defender's Office, was on brief for
appellant.
Nadine Pellegrini, Assistant U.S. Attorney, with whom Donald
K. Stern, United States Attorney, was on brief for appellee.

December 12, 2000

**COFFIN, Senior Circuit Judge.** Appellant Andres Campa was arrested when he went to retrieve a package of counterfeit alien work permits ("green cards") at an apartment targeted by law enforcement authorities because a series of suspicious packages had been delivered there. He entered a conditional plea of guilty to charges relating to the counterfeiting and fraudulent use of various identification documents, reserving his right to appeal the district court's denial of his motion to suppress all evidence and statements obtained by authorities after his arrest. See 18 U.S.C. §§ 1028(a)(1), (a)(5), 1546(a); 42 U.S.C. §§ 408(a)(7)(c). Campa now brings that appeal, claiming that the district court erred in failing to find that he was unlawfully detained and searched upon entering the apartment. Our review of the record and relevant case law persuades us that the only Fourth Amendment violation that occurred — an improper frisk — was unrelated to appellant's arrest and did not give the government access to the incriminating evidence. We therefore affirm the denial of appellant's suppression motion.

## I. Factual Background

For nearly a year before March 1999, the United States Postal Inspection Service had been investigating suspicious Express Mail packages addressed to 74 Thornton Street in Revere, Massachusetts. On March 19, Inspector Michael McCarran posed as

a mailman and delivered the latest such package. Three other law enforcement officers accompanied him, but initially remained in the postal truck.[1]

A man later identified as Jose Bullon came to the door, stated that he was the addressee, "<u>Francisco Valencia</u>," and signed the name "<u>Francis Palencia</u>" on the delivery mail receipt. McCarran then summoned the other officers. Bullon agreed to speak with them and consented to the package being opened. Inside were forty blank green cards. Bullon admitted that Valencia was a fictitious name and that he was accepting the package for a man he knew as "Gorrito." He described Gorrito as a Hispanic male in his early twenties who usually wore a baseball cap. Bullon reported that Gorrito paid him $50 per package and that he previously had accepted about ten packages. Bullon stated that Gorrito manufactured the fraudulent documents in a nearby apartment on Highland Street. Expressing fear of retaliation if Gorrito learned of his cooperation, Bullon nonetheless disclosed that Gorrito was due at the Thornton Street apartment at about 2 p.m. that day, and he agreed to go with one of the officers to point out the Highland Street apartment.

---

[1] The others were Massachusetts State Trooper Mark Marron, U.S. Customs Agent James Burke, and Revere Police Department Detective Tony Arcos.

-4-

At about 2:30 p.m., shortly after Bullon returned to the Thornton Street location, Bullon and McCarran saw two Hispanic males walking down the street toward the apartment. Bullon identified one of the men, who was wearing a baseball cap, as Gorrito. He later was identified as appellant Campa. Appellant and the other man, Enrique Lara-Valirde, entered the apartment without knocking and were confronted just inside the door by three officers, who identified themselves, ordered the men to face the hallway wall, and then conducted a pat-down search. During the frisk of appellant, Trooper Marron took keys, a beeper and a wallet from his pockets, dropping the items to the floor as they were removed. Appellant and Lara-Valirde then were escorted to the kitchen, where they sat down at a table. McCarran gathered the items removed during the frisk and placed them on the table.

At this point, the officers asked for identification. Lara-Valirde admitted that he had no identification and was in the United States illegally. Marron, a non-Spanish speaker, attempted to communicate with appellant by saying the word "identificacion" two or three times. In response, Campa took a New Jersey driver's license from his wallet and handed it to the

officer.[2]  Marron recognized the license as a counterfeit and placed Campa under arrest.  About one minute had elapsed since the men entered the kitchen.

Campa, who spoke little or no English, was read Miranda warnings in Spanish and immediately signed a Spanish-language form waiving his rights.  He acknowledged his involvement in counterfeiting and consented to a search of his Highland Street apartment.  There, he identified keys to open the front door and a locked closet.  In the closet, officers discovered a substantial quantity of counterfeit documents as well as equipment for manufacturing false identification materials.  A short time later at police headquarters, Campa made additional incriminating statements after again being advised of his rights.

Appellant subsequently moved to suppress the counterfeiting materials found in the Highland Street apartment and his statements to authorities admitting culpability.  He argued that the officers did not have the requisite level of suspicion to

---

[2] Campa testified at the suppression hearing that Trooper Marron removed the license from his wallet without his consent, but the district court "d[id] not find Campa credible on this point."  In the absence of clear error, we accept the district court's factual findings, particularly with respect to the credibility of witnesses. United States v. Forbes, 181 F.3d 1, 7 (1st Cir. 1999).  We find no such error here and therefore assume that Campa handed the license to Marron.

justify the stop and pat-down search, that his arrest was unlawful, and that his confessions and all physical evidence seized should be suppressed as "fruit of the poisonous tree," Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).

After a two-day evidentiary hearing, the district court concluded that the officers had a sufficient basis to detain Campa briefly for the purpose of exploring his relationship to the counterfeit green cards, but that the accompanying frisk was excessive in scope because the officers removed all items from his pockets without regard to whether they might be weapons. The court nonetheless refused to suppress any of the challenged evidence on the theory that its discovery was inevitable given the authority of the police to determine Campa's identity. The court believed that, even with a more limited frisk, Campa either would have provided the New Jersey license voluntarily, or the officers could and would have searched him to obtain it. On appeal, appellant renews his claim that the officers lacked even the reasonable suspicion necessary to conduct an investigatory stop authorized by Terry v. Ohio, 392 U.S. 1 (1968), and he maintains that the actions they took constituted a de facto arrest that needed to be supported by the higher standard of probable cause. He asserts that neither the record

nor case law supports the district court's inevitable discovery theory.

We review the district court's findings of fact for clear error, but give de novo consideration to its legal conclusions. United States v. Cruz, 156 F.3d 22, 26 (1st Cir. 1998). We will uphold a district court's decision to deny a suppression motion if the decision is supported by any reasonable view of the evidence. United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996).

## II. Discussion

This case requires us to examine closely two different interactions, minutes apart, between law enforcement officers and appellant. The first occurred in the hallway of the Thornton Street apartment when officers stopped and frisked appellant and Lara-Valirde immediately after their entry into the apartment. The second occurred in the kitchen when the officers demanded identification, prompting appellant to produce the false New Jersey driver's license. Appellant contends that the officers' conduct during the first encounter was unlawful, and he asserts that the license and all other evidence and statements subsequently obtained were fruits of that illegality. He specifically maintains that the unlawful removal of his wallet from his pocket in the hallway led to his turning over

-8-

the phony New Jersey license and, consequently, to his arrest. Though we agree that the pat-down was flawed, we disagree that it tainted the second encounter. We begin our analysis by reviewing relevant Fourth Amendment jurisprudence.

A. The Terry Stop-and-Frisk Standards

A warrantless search violates the Fourth Amendment unless it falls within one of the few carefully limited exceptions to that important constitutional protection. Minnesota v. Dickerson, 508 U.S. 366, 372 (1993); United States v. Woodrum, 202 F.3d 1, 6 (1st Cir. 2000). A consensual search is one such exception. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999). Another was recognized in Terry, which held that a police officer with reasonable suspicion of criminal activity may detain a suspect briefly for questioning aimed at confirming or dispelling his suspicions. See Dickerson, 508 U.S. at 372-73; Woodrum, 202 F.3d at 6. The officer making the stop must possess "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21; Woodrum, 202 F.3d at 6.

In addition to the stop for questioning, Terry permits a pat-down search for weapons based on an objectively reasonable belief that the suspicious individual is armed and presently

dangerous.  <u>Dickerson</u>, 508 U.S. at 373.  Such a protective search, designed to allow the officer to conduct his investigation without fear of violence, must be "strictly 'limited to that which is necessary for the discovery of weapons.'"  <u>Id.</u> (quoting <u>Terry</u>, 392 U.S. at 26); <u>see</u> <u>also</u> <u>Adams</u> v. <u>Williams</u>, 407 U.S. 143, 146 (1972).  Typically, this will be "a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault."  <u>Sibron</u> v. <u>New York</u>, 392 U.S. 40, 65 (1968).  If the frisk goes beyond what is necessary to determine if the suspect is armed, its fruits will be suppressed.  <u>Dickerson</u>, 508 U.S. at 373, 378-79; <u>see</u> <u>also</u> <u>United States</u> v. <u>Schiavo</u>, 29 F.3d 6, 9 (1st Cir. 1994) (affirming suppression where officer's continued exploration of a bulging paper bag in suspect's pocket "'after having concluded that it contained no weapon was unrelated to the sole justification of the search under <u>Terry</u>'") (quoting <u>Dickerson</u>, 508 U.S. at 378).

B. <u>The Hallway Encounter</u>

Appellant contends that the hallway encounter was not a lawful <u>Terry</u> stop because it was not justified by sufficiently concrete and reasonable suspicion of criminal activity.  He further argues that, in any event, the seizure and search

exceeded the bounds of a permissible Terry stop and thus constituted a de facto arrest unsupported by probable cause.

1. The Stop. We have little difficulty in concluding that the hallway stop fit comfortably within the Terry framework. The officers knew that a package containing fraudulent documents had been delivered to the apartment and that a series of similar deliveries had occurred over the last year. Bullon reported that an individual known as Gorrito was the intended recipient of the package that day and that he previously had received about ten similar packages. Bullon further disclosed that Gorrito, who customarily wore a baseball cap, would be returning to the apartment at about 2 p.m. Although Bullon's credibility was previously untested, the officers had the opportunity to assess his truthfulness in an extended face-to-face encounter, and they remained with him until his information was partially corroborated by events. Bullon's own admission of complicity, see, e.g., United States v. Shaefer, 87 F.3d 562, 566 (1st Cir. 1996), and the risk of police retaliation for giving false information, see Commonwealth v. Melendez, 407 Mass. 53, 57, 551 N.E.2d 514, 516 (1990), added to the likelihood of his veracity. Consistent with Bullon's report, appellant, wearing a baseball cap, arrived at the apartment at about 2:35 p.m., and was identified by

-11-

Bullon as he approached the building. These factual circumstances, specifically pointing to appellant, gave officers ample basis for a reasonable suspicion that he was involved in illegal activity and justified a brief detention to investigate whether those suspicions were correct.

2. The Detention. We also reject the contention that the hallway encounter evolved into a de facto arrest. The detention was brief — a few minutes from the time the men arrived in the apartment until they were moved to the kitchen — and the circumstances were nearly the least intrusive possible for a stop and frisk. See, e.g., United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998) (courts must examine the totality of the circumstances "to locate a particular sequence of events along the continuum of detentions"); see generally United States v. Acosta-Colon, 157 F.3d 9, 14-15, 21 (1st Cir. 1998) (describing distinctions between investigatory stops and more coercive detentions); United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (same). Although appellant emphasizes that the two men raised their hands when asked to face the wall for the frisk, this form of compliance with the officers' instructions does not make the interaction tantamount to an arrest. The officers did not display weapons, use handcuffs or exert any physical force on the two men. Directing them to move the few steps from the

-12-

hallway to the kitchen, presumably a larger space and thus a more natural setting for conversation, in all likelihood defused some of the tension surrounding the hallway frisk; it certainly was not a dramatic change in the officer-suspect relationship that converted a Terry stop into an arrest.

It may be that the restriction on appellant's liberty felt more severe in this private apartment than it would have felt in an open public setting, see Zapata, 18 F.3d at 975 (among factors indicating Terry detention rather than de facto arrest was that encounter occurred in a public place), but appellant was neither isolated nor in a law-enforcement environment, and his movements were restrained no more than was minimally necessary for officers to conduct investigative questioning. We note that, in addition to the two newly arrived suspects and the law enforcement officers, there were four other individuals in the apartment. Cf. Florida v. Royer, 460 U.S. 491 (1983) (suspect placed, with two officers, in a closet-sized room approximately 40 feet from the original encounter); Acosta-Colon, 157 F.3d at 16 (suspect was handcuffed and taken to an interrogation room in a secured area "much farther than 40 feet" from where he was stopped). The circumstances of the hallway inquiry, conducted very quickly in this non-custodial setting, fell well short of an arrest.

-13-

3. The Pat-down Search. We agree with appellant and the district court, however, that the pat-down search conducted by the officers exceeded the permissible scope of a Terry detention. We are satisfied with the officers' judgment that a pat-down was justified, in light of Bullon's expression of concern for his safety if he betrayed Gorrito and the uncertainties of confronting the two men in an apartment where at least three other individuals of unknown allegiance were present. The officer who frisked appellant, Trooper Marron, acknowledged, however, that he made no attempt to distinguish between bulging items that could be weapons and other types of concealed objects, reaching into appellant's pockets whenever he felt a protrusion and emptying all items onto the floor. If this indiscriminate removal of items embraced objects that were readily identifiable by touch as non-weapons, then the further invasion of appellant's privacy occasioned by removing them from his pockets was unnecessary and thus unlawful. See Terry, 392 U.S. at 29 (protective search for weapons "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer"); 4 Wayne R. LaFave, Search and Seizure § 9.5(c) (3d ed. 1996) (discussing "what tactile sensations produced by the pat-down will justify a further

intrusion into the clothing of the suspect"); cf. Dickerson, 508 U.S. at 375-76 ("plain feel" doctrine allows seizure of contraband detected during weapons frisk when "a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent").

Although we recognize that searching by means of a pat-down is not an exact science, the government does not even argue that Trooper Marron thought appellant's wallet — the item particularly at issue here — could be a weapon. He simply removed every bulging object as he searched, undoubtedly a convenient method for detecting weapons, but one that goes beyond the limited invasion of privacy authorized by Terry and its progeny. That the items were not actually "seized" and retained by the officers — and, indeed, might have been returned to appellant had he asked — minimizes the violation but does not erase it. We therefore conclude that appellant was subjected to an unlawful frisk.

C. The Kitchen Encounter

We differ with appellant, however, in our assessment of the impact of that constitutional violation.[3] He claims that, once

---

[3] The district court relied on the "inevitable discovery" doctrine to conclude that the officers would have obtained the license regardless of the nature of the frisk, holding that the

the officers had removed the wallet from his pocket and placed it within sight on the kitchen table, he was deprived of the choice to withhold its contents and thus was coerced into turning over the license. The illegality of the pat-down, however, rests on the assumption that the officers unquestionably knew that certain of the items they removed from his pockets were not weapons. The wallet, in particular, was most easily identified as a non-weapon, and was almost certain to have been accurately recognized by feel. We are unpersuaded that the difference between the officers' virtual certainty that he carried a wallet and the wallet's presence on the kitchen table is so significant that appellant's yielding of the license in the former case would be voluntary while in the latter it would be involuntary. Indeed, we reached a similar conclusion as to the coerciveness of taking a wallet in Forbes, 181 F.3d at 6 n.6, where we rejected the contention that an officer's illegal removal of a wallet during a Terry frisk "would so overbear [the suspect's] will that his failure to withdraw his consent [to a search] should be deemed involuntary." Here,

officers could have taken the license from appellant even if he had refused to produce it voluntarily. We have been pointed to no federal cases supporting such an "identity search" exception to the Fourth Amendment's warrant requirement, but find it unnecessary to consider the question any further because of our conclusion that appellant turned over the license voluntarily.

-16-

where the officers never, in fact, took possession of the wallet – placing it on the floor and then on the table – we are similarly unconvinced that the exposure of the wallet influenced appellant's decision to respond to the demand for identification.

This is not to say, of course, that the circumstances were entirely free of compulsion. The reality is that police officers seeking to obtain information from a suspect in a <u>Terry</u> stop are likely — and expected — to use one or more techniques with coercive impact, <u>see</u> <u>Kolender</u> v. <u>Lawson</u>, 461 U.S. 352, 364, 366 (1983) (Brennan, J., concurring); <u>Zapata</u>, 18 F.3d at 976-77, and they are permitted to ask their questions "in a way calculated to obtain an answer," <u>Kolender</u>, 461 U.S. at 366 (Brennan, J., concurring). Although officers "may not <u>compel</u> an answer," <u>id.</u> (emphasis in original); <u>McCarthy</u>, 77 F.3d at 531,

> [d]uring such an encounter, few people will ever feel free not to cooperate fully with the police by answering their questions. . . . Our case reports are replete with examples of suspects' cooperation during <u>Terry</u> encounters, even when the suspects have a great deal to lose by cooperating.

<u>Kolender</u>, 461 U.S. at 364 (Brennan, J., concurring). We are confident that this was just such a situation. Faced with an officer pressing him for "identificacion," we think it unsurprising that appellant responded with his driver's license, just as Lara-Valirde answered with the incriminating information

-17-

that he was an illegal alien and had no identification.  Indeed, there is no basis for concluding that appellant knew that the license was facially identifiable as a fake, and he may well have thought he could avoid greater difficulty by presenting it. But whatever his precise motivation, we conclude that disclosure of the license was not tainted by the earlier unlawful frisk.[4]

We therefore affirm the district court's denial of appellant's motion to suppress the evidence of counterfeit document production that was obtained following his arrest.

Affirmed.

---

[4] Appellant seems to argue that, even if the unlawful frisk had no effect on his producing the license, it could have influenced his decision to cooperate in the search of the Highland Street apartment because his "first instinct, given that the officers already had his wallet, may have been to cooperate and confess." We reject the suggestion that the government must disprove this highly speculative scenario. There is no factual support for linking the post-arrest cooperation with the illegal frisk.  See Segura v. United States, 468 U.S. 796, 815 (1984) ("[O]ur cases make clear that evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence.  Suppression is not justified unless 'the challenged evidence is in some sense the product of illegal governmental activity.'") (citation omitted).