UNITED STATES of America

v.

Vince E. THOMAS, Defendant

No. CR. 01–82–P–C.

United States District Court,
D. Maine.

March 6, 2002.

Robert J. Ruffner, Vincent & Kantz, Portland, ME, for Vince E Thomas, defendant.

George T. Dilworth, AUSA, Office of the U.S. Attorney, Portland, ME, for U.S. Attorneys.

"[T]here is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks*, 480 U.S. 321, 329, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347 (1987) (J. Scalia).

## MEMORANDUM OF DECISION AND ORDER GRANTING IN PART, AND DENYING IN PART, DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, District Judge.

In this case, Defendant Vince E. Thomas was indicted for being a felon in knowing and unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The Court now has before it Defendant's *Motion to Suppress* (Docket No. 13), in which he seeks suppression of a firearm as well as statements made by Thomas to law enforcement officers. Defendant argues that suppression is appropriate because the gun was discovered by a search and seizure violative of the Fourth Amendment. Defendant's statements may be grouped into four categories: (1) statements made at the Lake District area, (2) statements made at the apartment before the gun was discovered, (3) statements made at the apartment immediately upon discovery of the firearm, and (4) statements made to Officer Randy St. Laurent at the Androscoggin County

Jail after administration of a *Miranda* warning. Suppression of all the statements is appropriate, Defendant argues, because the first three groups of statements were made while he was in custody without benefit of *Miranda* warnings, and the last statements, although made post-*Miranda*, should nevertheless be suppressed as "fruit of the poisonous tree," resulting from the prior unconstitutional seizure of the gun and *Miranda* violations. The Government opposes the motion, arguing that the warrantless seizure of the firearm was constitutional under the "plain view" exception to the Fourth Amendment and the statements are admissible because they were voluntarily made while Defendant was not in custody.

## I. FACTS

Auburn Police Lieutenant Thomas Roth ("Lt.Roth") observed Defendant Vince Earl Thomas, a black male, and Vicky Edwards, a white female, standing beside a car at the Water District turnaround in Auburn, Maine at approximately midnight on September 5, 2001. Tr. at 3–4, 64, 71–72.[1] The area is posted no trespassing from sunset to sunrise. Tr. at 4. Lt. Roth testified that he approached and asked both individuals for identification "[b]ecause both of them were involved in criminal trespass [as] they were present after sunset."[2] Tr. at 5–6. Ms. Edwards produced a Maine driver's license, and the car was registered to her. Tr. at 4–5. Defen-

dant indicated that he did not have any identification (hereinafter "ID") with him. Tr. at 6.

When asked his name and date of birth, Defendant stated that his name was Earl Thomas and hestitated before replying that his date of birth was May 15, 1974. *Id.* Lt. Roth testified that in his experience: "when people are hesitant to give me their name and date of birth ... they are fabricating." Tr. at 7. Lt. Roth also testified that he observed Defendant wearing a handcuff key chain on his outer garment, which he believed "was kind of odd." Tr. at 7. After Defendant stated that he had a Florida ID card, Lt. Roth asked the dispatcher to check the records in Maine and Florida for an Earl Thomas, born May 15, 1974, to determine whether he was "wanted."[3] Tr. at 7–8. Lt. Roth testified that he wanted to see an ID, run it through the database, and have it come back that Defendant was not wanted before allowing Defendant to go. Tr. at 14. Searches of both databases turned up no record of such person. Tr. at 7–8. Lt. Roth testified: "I advised [Defendant] that I could hold him until I received proper ID because he was involved in criminal trespass."[4] Tr. at 9, 34. Lt. Roth failed to inform Defendant about "that part of the statute that says you can hold him for two hours." Tr. at 40, 17–A M.R.S.A. § 15–A(2).

After another Auburn Police Officer, Stephen Burns, arrived on the scene, Lt.

---

1. Officer Burns testified that "shortly after midnight ... [he] heard that Lieutenant Roth made a stop by Lake Auburn by a pull[ed] over vehicle and [he] proceeded in that direction to back him up." Tr. at 71–72.

2. Lt. Roth testified that he requested identification because the police department keeps records of warnings given, and the officers "normally issue a summons for criminal trespass ... [only] if someone was in there twice." Tr. at 31, 30.

3. Lt. Roth testified that if a person has a valid state identification, the computer databases that were checked would indicate a record of it. Tr. at 7–8.

4. However, Lt. Roth did not ask the dispatcher to check the Auburn Police Department records to see if Defendant had previously been issued a warning for the trespassing offense. Tr. at 32, 62–64.

Roth continued questioning Defendant, who told him that he was staying at Carol Chandler's apartment at 169 Bartlett Street in Lewiston, provided her phone number, and stated that his ID was there. Tr. at 10, 11, 72. Officer Burns stood between Defendant and Ms. Edwards while Lt. Roth called Ms. Chandler from his cruiser. Tr. at 11. Ms. Chandler told Lt. Roth that a man who went by the nickname "Black" was currently staying with her and that he had received mail at her apartment addressed to Vince Earl Thomas. Tr. at 10–11, 12, 139. After speaking to Ms. Chandler, Lt. Roth asked Defendant if he had previously given him a middle name, and Defendant denied that he had done so. Tr. at 12. The dispatcher then notified Lt. Roth that a person named Vince Thomas had been involved in a domestic incident at 169 Bartlett Street on August 21, 2001. Tr. at 12; *see also* Complaint, Affidavit of Officer St. Laurent (hereinafter "St. Laurent Aff.") (Docket No. 1) at 2. Lt. Roth testified that he asked Defendant if he had ever been in jail or released on probation, and Defendant responded that he had not. Tr. at 23, 60. Lt. Roth testified that at that point he did not believe that Defendant was telling the truth about his identity; and he asked Defendant to go to Bartlett Street to retrieve his ID. Tr. at 13, 14, 35, 40. Lt. Roth testified that he told Defendant that, provided he was not wanted, if he produced a valid ID, he would then be free to go. Tr. at 13, 40. Defendant would not have been free to leave if he had not

agreed to go with the officers and to provide his ID. Tr. at 40–41. Lt. Roth testified that he "could have arrested" Defendant at any point for criminal trespassing. Tr. at 38–39.

Defendant agreed to go to Lewiston with the officers and got into the back seat of Officer Burns's cruiser, which was locked so that it could not be opened from the inside.[5] Tr. at 83–84. Officer Burns testified that he did not handcuff Defendant because it was a "voluntary transport," but that if Defendant had asked him to stop or to let him out of the vehicle, Officer Burns would not have let him go. Tr. at 75, 84. The trip from Auburn to Lewiston lasted approximately 10 minutes. Tr. at 16. Lt. Roth drove in his own cruiser to 169 Bartlett Street. Around 1:00 a.m. Lewiston Police Officer Richard Stanton was dispatched to back up the Auburn Police officers; and he met Lt. Roth, Officer Burns and Thomas outside 169 Bartlett Street around the time they arrived. Tr. at 16, 88.

Despite the conflicting testimony about how the officers gained entry into the house, the Court is satisfied that the four men approached the house and someone knocked on the door, and either Ms. Chandler or her son, Jason Moody, opened the door.[6] Tr. at 16–17, 77–78, 90. Officer Stanton testified that Defendant entered first, followed by Roth, Burns, and Stanton. Tr. at 90. Ms. Chandler testified that she knew Defendant was coming over to get his ID and that she and her son had

---

5. Ms. Edwards was permitted to drive away from the scene in her car without a check of whether she had been previously warned for trespass and without being given a summons. Tr. at 32–33.

6. Lt. Roth testified that he knocked on the door and Ms. Chandler answered (Tr. at 16); Mr. Moody testified that he answered a knock and he let only Defendant in, but the officers

pushed open the door again as he was closing it (Tr. at 111); Officer Stanton testified that he didn't recall anyone knocking, that the door was unlocked, and that Defendant opened it and entered followed by the officers (Tr. at 90). Officer Stanton further testified that he did not see anyone come to meet them at the door or immediately after they entered the apartment (Tr. at 90).

no objection to that.[7] Tr. at 129–30, 139. Ms. Chandler came downstairs and was present for some of the time that Defendant was searching through his things, but at some point, she went back upstairs. Tr. at 21, 140. Mr. Moody was present in either the living room or the kitchen while Defendant looked for his identification. Tr. at 91–92. Officer Stanton testified that he was watching Mr. Moody "[t]o make sure he didn't cause any problem or put anybody in danger." Tr. at 92.

The officers entered into the kitchen and then walked into the living room after Defendant said, "that's where I'm staying," and Lt. Roth testified, "that's where we went ... because it was obvious that's where his things were." Tr. at 21, 44. When they arrived in the living room, Defendant "proceeded to go to the area where the luggage was stacked on the floor and started opening luggage to look for identification." Tr. at 78. While Defendant "was going through some of his luggage [Officer Burns] noticed a large envelope.... [He] asked [Defendant] what it was and if [he] could see it."[8] Tr. at 78–79, *see also* Tr. at 94. Defendant gave Officer Burns the manila envelope containing several ID papers, including what appeared to be school records or transcripts of Vince Earl Thomas, and a photocopy of a Florida ID card with the name Vince Earl Thomas and a birth date of May 15, 1975—one year later than the date Defendant had earlier told Lt. Roth. Tr. at 20, 22, 44, 78–79. Lt. Roth then asked the dispatcher to run a records check with the new name and birthdate. Tr. at 22–23. Lt. Roth testified that he wanted to know whether Defendant was wanted or was violating any conditions of probation. Tr.

at 50, 60–61. Lt. Roth learned from the dispatcher that Defendant had a valid Florida ID card and that there were no outstanding warrants for his arrest, but that he was a registered sex offender in Florida. Tr. at 23, 51, 59.

Lt. Roth testified: "I felt there might be drugs present.... and I felt [that Defendant] was hiding [something], ... but I didn't know what." Tr. at 24. Lt. Roth asked Defendant more questions about his sex offender status and also repeatedly asked him: "What are you trying to hide?" Tr. at 23, 25, 50, 53, 80. In response to the questions about being a sex offender, Defendant "said he had been charged with assault and kidnapping." Tr. at 23–24, 52–53. Roth testified that at this time, he was still detaining Defendant for not providing ID, and for "a short amount of time" after the dispatcher had reported that Defendant was not wanted, Lt. Roth said: "I was still continuing my identification request, investigation into why he was deceptive. I wanted to look into the sex offender status and those types of things ... to see whether he was on probation or conditions he could not be with minors or anything like that." Tr. at 50. Lt. Roth stated that, after finding out Defendant was not wanted, he was "not going to issue a summons for trespass;" however, he further testified that he was also motivated by his belief that "a lot of times there could be a warrant and the dispatcher does not get that" when dealing with someone from "out-of-state." Tr. at 51–52. Lt. Roth testified that after he received the ID and asked the dispatcher to run it, he was "attempting to determine if there was additional bases ... to take some type of action with respect to detaining [Thomas]."

---

**7.** No one told the officers that they were not permitted to enter and no one asked them to leave. Tr. at 18, 130, 146.

**8.** Lt. Roth testified that the officers had been present on the scene "for several minutes, probably 8[to] 10 minutes before [Defendant] found that paperwork." Tr. at 44.

Tr. at 53. Lt. Roth also testified that after seeing what he thought was marijuana residue on a nearby table, he asked Officer Stanton to call for a canine unit.[9] Tr. at 24, 47, 61.

Lt. Roth testified that he "confronted" Defendant with the questions: "[W]hy are you telling me that you're Earl Thomas? Now I have an ID telling me that you're Vince Earl Thomas; are you wanted? Are you on probation?" Tr. at 37. Officer Stanton testified that he heard Defendant say that he had been in prison for about ten years. Tr. at 95. Lt. Roth testified that he assumed Defendant had a felony record, in part because of Defendant's admissions and in part because the dispatcher informed Roth that Defendant was a registered sex offender in Florida. Tr. at 24, 59. Lt. Roth asked Defendant why he had not been truthful about his criminal record. Tr. at 24–25, 50, 60.

As Lt. Roth was questioning Defendant, Defendant replaced one piece of luggage back on top of another piece and then sat down on the pile. Tr. at 80. Lt. Roth testified that, in response to his questions, Defendant "just really stopped talking and sat on the duffle bags." Tr. at 25. Lt.

Roth testified that he thought Defendant's behavior was "odd"; that he couldn't see what Defendant "was doing as well as when he had been standing up," and that Defendant could still reach into his bags. Tr. at 25. Lt. Roth testified that, because he was concerned for his safety, he "asked [Defendant] to stand up." Tr. at 25. At that point, Defendant stood up and stepped away from the bags. St. Laurent Aff. at 3.[10]

Officer Stanton testified that he then saw Lt. Roth move Defendant's bag with his foot, and that after the bag was moved, a gun became visible.[11] Tr. at 97; *see also* St. Laurent Aff. (recounting the events described in Officer Stanton's police report). Officer Stanton testified that before Lt. Roth picked up the gun, Officer Stanton saw it on the floor. Tr. at 100–01. According to Officer Stanton, Lt. Roth then asked Defendant, "What's that?" as Lt. Roth bent and picked up the gun.[12] Tr. at 101. In response to Lt. Roth's question, Defendant replied, "It's a gun." Tr. at 26, 99. After bending down and picking up the gun, Lt. Roth asked, "Is it loaded?" and Defendant replied that it was.[13] Tr. at 26, 27, 93.

---

9. The canine unit did not arrive until after the gun had been found and Defendant had been handcuffed; a search by the dog found no drugs on the premises. Tr. at 61.

10. St. Laurent's affidavit only summarizes Roth's and Stanton's reports. Neither Roth's nor Stanton's report was introduced into evidence at the hearing.

11. Officer Stanton wrote in his report: "Officer Roth asked [Defendant] to step away from the bag. Officer Roth then moved the bag with his foot." St. Laurent Aff. at 3. Officer Stanton testified that "he was watching the [Defendant]" and the gun was not visible before the bag was moved because "it was under the bag." Tr. at 101. At the suppression hearing, Officer Stanton testified consistently with what he wrote in his report; namely, that he saw Lt. Roth "slightly with his foot, he

like moved, pushed [the bag] aside." Tr. at 99.

12. The gun was found at approximately 1:28 a.m. Tr. at 27–28. At 1:33 a.m., Lt. Roth radioed the dispatcher with the serial number of the gun to determine whether it was stolen. Tr. at 27–28.

13. The Court does not find Lt. Roth's or Officer Burns's testimony credible on this point. Lt. Roth and Officer Burns did testify consistently that Lt. Roth asked Defendant, "What's this?" or "What's that?," to which Defendant replied, "It's a gun," and that Lt. Roth asked Defendant whether it was loaded, and Defendant replied that it was. Tr. at 25, 26, 80–81. The officers' testimony contradicts Officer Stanton's account, however, with regard to the timing of events, and the Court credits

Officer Stanton testified that he then arrested Defendant, placing him in handcuffs, for "Possession of a firearm by a felon." Tr. at 95. Defendant was taken into the kitchen. Tr. at 82. The officers transported Defendant to the Androscoggin County Jail. Tr. at 96. At approximately 1 p.m. on September 6, 2001, Central Maine Violent Crime Task Force Special Agent Randy St. Laurent went to the jail to interview Defendant regarding the firearm. Tr. at 105. The parties stipulated that Officer St. Laurent gave Defendant "proper and sufficient" *Miranda* warnings before questioning him. Tr. at 106–07. Defendant gave incriminating responses to St. Laurent's questions, including admitting that he was a convicted felon, that the gun had been in his possession when it was found, and that he had obtained the gun from someone in Georgia.[14]

## II. DISCUSSION

### A. The Gun: Search

Defendant maintains that the gun was obtained by an unlawful search and seizure in violation of his Fourth Amendment rights. The Government argues that the officers seized the gun after observing it in plain view. The Fourth Amendment protects an individual's reasonable expectation of privacy against intrusion by the government and, by its terms, prohibits unreasonable searches and seizures. The Supreme Court has noted, "there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" *New York v.*

---

Officer Stanton's testimony that the gun was not visible to any of the officers before Lt. Roth moved the bag with his foot. Officer Burns also testified that he did not see the gun before Lt. Roth asked, "What's this?," but he testified that Lt. Roth asked the question while Defendant was sitting down on his bags and going through his things. Tr. at 80–81, 82, 85. This is not consistent with any other testimony in the record. Officer Burns said that, after Lt. Roth asked the question, he looked over and the gun "appeared to be laying on the floor outside of the bag partially concealed." Tr. at 82.

Lt. Roth testified that he first observed something shiny, and then he asked: "'What's this?,' Defendant said, 'it's a gun,' and at that point I moved the duffle bag [with my foot, and] asked him, prior [sic] if it was loaded and he said it was." Tr. at 25, 26. Upon further questioning, Lt. Roth stated: "I kicked it out of the way," after Defendant responded that the gun was loaded. Tr. at 27. When asked whether he searched Defendant's bags *after* finding the firearm, Lt. Roth confusingly testified: "I remember looking through not to the point that I would have emptied the contents. I remember moving around to see where the gun was." Tr. at 61.

Although testimony from Carol Chandler and Justin Moody tends to corroborate Officer Stanton's testimony on this point, the Court did not find these witnesses credible on this issue and does not, therefore, rely on their statements. Ms. Chandler testified that Defendant produced an ID from his wallet, rather than a photocopy of an ID, and she testified that the officers unzipped Defendant's bags and looked through them for 4–5 minutes. Tr. at 143–44. Mr. Moody's testimony about Defendant producing a copy of his ID was consistent with much of the other evidence; however, he also testified that the officers unzipped Defendant's bags and looked through them briefly, finding the gun almost immediately. Tr. at 114–15. Both Chandler and Moody admitted that they do not like the Auburn Police Department, and that they have a civil suit pending against the Auburn Police Department and the Androscoggin County Sheriff arising from a strip search that allegedly occurred during a traffic stop of Mr. Moody when he was a minor. Tr. at 134, 147, 148–50.

14. Officer St. Laurent's report summarizing this interview was admitted for the limited purpose that the record for suppression include the statements Defendant made. Tr. at 107–08; *see also* Complaint, St. Laurent Aff. (Docket No. 1).

*Class*, 475 U.S. 106, 116, 106 S.Ct. 960, 967, 89 L.Ed.2d 81 (1986) (*quoting Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968) (footnote omitted) (brackets as in *Terry* )). Further, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, justifiably warrant that intrusion." *Id.*, 475 U.S. at 116–17, 106 S.Ct. at 967. In balancing governmental interests against governmental intrusion, the factors to be considered include: whether the safety of the officers is served by the governmental intrusion; whether the intrusion was minimal; and whether the search stemmed from some probable cause focusing suspicion on the individual affected by the search; *e.g.*, the officers' probable cause could stem from directly observing respondent commit a violation of the law. *Id.*, 475 U.S. at 117–18, 106 S.Ct. at 968.

### 1. "Plain View" Exception to the Fourth Amendment

The Government argues that Lt. Roth observed the gun in "plain view" while he was lawfully present in the apartment and, therefore, that no warrant was required for its seizure. The "plain view" exception permits officers to seize objects that are in plain view where: (1) the officer was legally in a position to observe the seized evidence; (2) the officer had a lawful right of access to the evidence itself; and (3) the incriminating nature of the evidence was immediately apparent to the officer. *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112, (1990); *United States v. Jones*, 187 F.3d 210, 219–21 (1st Cir.1999). Defendant disputes all three elements of the test. The Court will address only the second element, which the Government has failed to satisfy.

### a. Officers' Lawful Right Of Access To The Evidence

Defendant contends that the gun was not in plain view until Lt. Roth illegally moved Defendant's bag with his foot, which then exposed the firearm to the officers. The Government argues that Lt. Roth testified that he could see the barrel of the firearm before moving the duffel bag with his foot. The record does not support his version of the crucial events.

Lt. Roth testified that he believed Defendant was hiding something—possibly drugs—and that he asked Defendant to stand up because he felt uncomfortable and couldn't as clearly watch what Defendant was doing when he was seated on the duffle bags. Officer Stanton testified consistently with his report written within a day after the events. Stanton's report states that, after asking Defendant to stand up, "Officer Roth asked [Defendant] to step away from the bag. Officer Roth then moved the bag with his foot." St. Laurent Aff. at 3. Officer Stanton testified that Lt. Roth then asked Defendant, " 'What's that?,' as he bent down and picked something up." Tr. at 93. Officer Stanton's testimony clearly and consistently described the order of events: (1) Lt. Roth moved the bag with his foot, (2) the gun became visible, (3) Lt. Roth then bent down and asked Defendant, "What's this?," while reaching for the gun. The Court does not credit Lt. Roth's testimony that he saw the gun before he moved the bag.

 In the absence of a warrant, a law enforcement officer needs probable cause to conduct a search. Here the evidence does not support a finding of probable cause. The Supreme Court has held that the moving of an object inside a suspect's home "unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion

of [Defendant]'s privacy unjustified by the ... circumstance that validated the entry." *Arizona v. Hicks,* 480 U.S. 321, 325, 107 S.Ct. 1149, 1152, 94 L.Ed.2d 347 (1987). In *Hicks,* officers had entered an apartment to search for a shooter and weapons immediately following a shooting, and, while present, they observed stereo equipment that they suspected was stolen. The Supreme Court held that, although the original lawful objective of the officer's entry into the apartment justified seizure of the weapons, the officer's moving of the stereo in order to obtain its serial numbers constituted a separate "search" because "the distinction between looking at a suspicious object in plain view and moving it even a few inches is much more than trivial for purposes of the Fourth Amendment." *Id.* (internal quotations omitted). The Court **FINDS** that Lt. Roth's unauthorized moving of the bag constitutes a search and that until the bag was moved the gun did not come into plain view. Therefore, the "plain view" exception to the Fourth Amendment does not apply.[15]

### B. The Statements: Custody

Defendant argues that he was in custody from the time he was told at the Lake District area that he would be free to leave only upon providing valid ID to the officers. Defendant claims that all of his statements resulted from custodial interrogation without the benefit of *Miranda* warnings and, therefore, that they should be suppressed. The Government concedes that Defendant was questioned without the benefit of *Miranda* warnings prior to his arrest, but disputes that Defendant was in custody. Specifically, the Government asserts that Defendant was not in custody until he was handcuffed after stating that the firearm was loaded. The Government analogizes this case to a *Terry* stop or a sobriety test, which the Supreme Court has held to be noncustodial despite the driver not being free to leave. *See Terry,* 392 U.S. at 29, 88 S.Ct. at 1884; *see also Berkemer v. McCarty,* 468 U.S. 420, 441, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

The safeguards provided for by *Miranda* apply to a person who is questioned by law enforcement officers after being taken into custody either by formal arrest or by a restraint on freedom of movement to the degree associated with formal arrest. *Stansbury v. California,* 511 U.S. 318, 321–22, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (*citing Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d

---

**15.** No other exception applies here. An officer's investigatory authority under *Terry* permits only a frisk of the person for weapons, and only where officers have reason to believe that a weapon is present. *See United States v. Scott,* 270 F.3d 30, 42 (1st Cir.2001) (*quoting Sibron v. New York,* 392 U.S. 40, 63–66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)). "[To conduct a] self-protective search for weapons, [an officer] must be able to point to particular facts from which he reasonably inferred that the individual [searched] was armed and dangerous." *Id.* A warrantless search is justified only by a showing of probable cause. Lt. Roth testified that he believed Defendant was being deceptive about *something* besides his identity and criminal status—possibly drugs— but that the officers did not have probable cause or even reasonable suspicion that ne- cessitated a search for weapons in particular. The evidence shows that the officers had been in the apartment for longer than ten minutes and closer to half an hour: the officers arrived around 1:00 a.m. and the gun was found around 1:28 a.m. Furthermore, there was no credible exigency or safety consideration. To the contrary, Lt. Roth testified that he "allowed [Defendant] to go through his bags" unimpeded. Tr. at 44. Lt. Roth stated that Defendant: "kind of pawed through a couple of duffle bags, ... [and h]e was kind of haphazardly going through them ... moving things around" for approximately eight to ten minutes. Tr. at 19, 44. Clearly Lt. Roth did not suspect there was a weapon in the bag and had no objectively reasonable basis to do so.

58

694 (1966)); *see also Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury*, 511 U.S. at 322, 114 S.Ct. 1526. The determinative issue in the custody inquiry involves whether and when a reasonable person in the suspect's position would believe that he or she is under arrest or believe that his or her freedom is otherwise significantly restrained. *See Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138. The Court considers the totality of the circumstances in conducting this fact-intensive inquiry in order to determine " 'how a reasonable [person] in the suspect's position would have understood his situation.' " *Stansbury*, 511 U.S. at 324, 114 S.Ct. at 1529 (*quoting Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151). Relevant considerations include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the investigation.' " *Jones*, 187 F.3d at 217–18 (internal quotations omitted).

Although the Supreme Court has acknowledged that a traffic stop constitutes a " 'seizure' within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief," *Berkemer*, 468 U.S. at 436–37, 104 S.Ct. 3138 (*quoting Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)), an "ordinary traffic stop" does not usually necessitate *Miranda* warnings. *Id.* at 437–38, 440, 104 S.Ct. 3138. In *Terry*, the Supreme Court articulated one such exception permitting a law enforcement officer, whose observations have led to a reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime, to detain that person briefly in order to investigate the circumstances that provoked suspicion. *See Terry*, 392 U.S. 1, 88 S.Ct. 1868. " [T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation,' " which typically permits an officer to ask a "detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138 (*quoting Terry*, 392 U.S. at 29, 88 S.Ct. at 1884).

### 1. Thomas's Statements At The Lake District Area

■ At the Auburn Lake District turnout, Lt. Roth asked Defendant for identification, and Defendant replied that he didn't have any identification with him. Lt. Roth then asked Defendant what his name was, and Defendant replied that it was Earl Thomas. After being notified that he was being detained for the purpose of determining his true identity, Thomas was questioned by Lt. Roth about the location of his ID. Tr. at 10. Lt. Roth testified that he told Defendant: "if you show me a valid ID and that you're not wanted then you're free to go and we will part and go our separate ways." Tr. at 13. Thomas responded by telling Lt. Roth where he was staying. Further questioning by Lt. Roth elicited responses from Defendant, including the name, address, and phone number for Carol Chandler, as well as statements regarding his criminal history. The Government relies on two distinct statutes for Lt. Roth's authority to detain Defendant: 17–A M.R.S.A. §§ 402(1)(C) and (2), which makes trespassing a misdemeanor, and 17–A M.R.S.A. § 15–A(2), which permits a law enforcement officer to detain for up to two hours a suspect who the officer has probable cause to believe has committed or is committing a crime

who intentionally fails or refuses to provide reasonably credible evidence of his or her name and address. Defendant responds that after the dispatcher found no record of a person named Earl Thomas, Lt. Roth believed that Thomas had lied about his identity and that, because he could detain him under Maine law, any further questioning of Thomas would likely lead to incriminating responses.

The Maine statute cited by the Government authorizes Lt. Roth to "attempt to verify" evidence of a person's name and address if it "does not appear to be reasonably credible." 17–A M.R.S.A. § 15–A(2). Intentional refusal to furnish such information can ultimately justify arrest—after informing the subject that such action constitutes a crime—but it also entitles an officer to ask identifying questions of the Defendant. *Id.* The Court need not reach Defendant's argument that the booking exception to *Miranda*, which permits officers to inquire into a suspect's name and address during the process of arrest, is inapplicable here. *See Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), *United States v. Scott*, 270 F.3d 30 (1st Cir.2001) *United States v. Doe*, 878 F.2d 1546 (1st Cir.1989). A determination that Defendant was in custody when this initial questioning took place at the Lake District area must precede such a discussion because *Terry* permits law officers to question a suspect for a brief time upon the officer's reasonable suspicion that criminal activity is afoot. *See Terry*, 392 U.S. 1, 88 S.Ct. 1868.

Applying the custody analysis to Defendant's initial stop, the Court **FINDS** the following facts relevant to the custody determination. The setting at the Lake District area was unfamiliar, but at least neu-

tral. During the course of the stop at the Lake District area, one officer and then a total of two officers and two subjects were present on the scene during the course of the questioning. Defendant was not physically restrained, but stood outside the vehicles. The investigation lasted less than an hour, commencing shortly after midnight and terminating at least ten minutes before 1 a.m., when they all left the scene for Lewiston. Finally, the character of the questioning related only to verifying Defendant's true identity and criminal status. The Court therefore **CONCLUDES** that the questioning that occurred before Defendant was placed in the police car did not diverge from that necessary "to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions," *Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138, initially raised by the trespassing, and then by Defendant's apparent hesitation to provide his true name. Because any custodial interrogation of Defendant at the Lake District area was both within the *aegis* of the Maine statute and the ambit of the *Terry* exception, he was not entitled to a *Miranda* warning, and his statements made there will not be suppressed.

### 2. Thomas's Statements At The Apartment

▮▮▮▮ After this questioning, Ms. Edwards was permitted to drive away; whereas Thomas was told he would be detained until he produced ID, placed in the back of a locked police car, and taken to his apartment in Lewiston. Tr. at 14, 74. The Government argues that the police transport to Lewiston did not rise to the level of arrest, citing that Officer Burns referred to it as a "voluntary transport." [16] Although Defendant apparently

---

**16.** Although protesting that Defendant was not in custody, the Government conceded at the suppression hearing that the circumstances surrounding the transport more close-

willingly agreed to be transported to Lewiston, the situation had surpassed that of a *Terry* stop and Defendant was substantially restricted. Defendant had been told that he would be detained until he provided valid ID and the police determined that he was not wanted. He was transported to Lewiston in a locked cruiser, and both Lt. Roth and Officer Burns testified that they would not have permitted Defendant to go unless and until they obtained a valid ID and determined that there were no outstanding warrants for his arrest or violations of probation conditions.[17] Defendant reasonably could have believed that he was not free to leave or to terminate the officers' inquiry into his true identity. The Court notes that Thomas did not get into the car with the person he came with after questioning was terminated at the Lake District area. In fact, if Defendant had not agreed in response to Lt. Roth's request that they go together to Lewiston to retrieve his ID, Lt. Roth and Officer Burns both testified that Defendant would not have been permitted to leave their supervision and control, and that fact would have been apparent to a reasonable person in Defendant's circumstances.

Although Thomas was detained and substantially restricted in his movements from the time he was put into the police car at the Lake District area, the officers nevertheless obtained consent to enter the Chandler home. For safety reasons, the officers were entitled to accompany Thomas to get his ID. The officers were admitted into the home, following Thomas. No one denied them entry, and no one objected to their presence. In fact, the occupants voluntarily complied with their directions. Defendant was still being lawfully detained by the officers until he satisfied them of his true identity and they had no further purpose to detain him.

Once inside the apartment, the officers remained close to Defendant at all times. Three officers remained in the same room with him, all the while peppering him with questions about why he had been deceptive. Although Defendant was not physically restrained, he was not free to leave, and no reasonable person in his position would have thought otherwise. Furthermore, after Defendant provided valid ID and the officers had determined he was not wanted, the officers nevertheless failed to "leave him alone" or to let up on their interrogation. Tr. at 40. At the apartment, Thomas's statements included: "that's where I'm staying," referring to the room where the firearm was found. Tr. 21. Thomas also told the officers that he had served time in prison and had been convicted of kidnapping and assault.

The Government has sufficiently alleged that new causes for reasonable suspicion arose at the apartment to justify Defendant's continued detention, including what Lt. Roth saw and thought to be marijuana residue and the confirmation of Defendant's earlier deception regarding his identity and criminal record. The Government argues that even after the officers had determined Defendant's true identity, the police had reason to believe that he was engaged in criminal activity and could, therefore, detain him and ask him ques-

---

ly approached such a status. The Government agreed that there is no "question but what ... an objectively reasonable person in the position of this defendant [during the transport] would have known that he was detained and that he was not free to leave." Tr. at 76.

17. There is nothing in the record that indicates that any questions were asked of Defendant or that he made any statements during the course of the transport.

tions. *See Terry*, 392 U.S. at 23–24, 88 S.Ct. 1868. Specifically, the Government argues that Defendant's statements about his criminal record and his initial lies to police officers justified further questions even after he had provided valid ID paperwork. *Id.* The officers knew or had reason to believe that Defendant was a felon, and they were not about to let him out of their tight control. By the time that Lt. Roth was insisting that Thomas come clean about why he had previously been deceptive—after the dispatcher had confirmed that his ID was valid and that no warrants were outstanding for his arrest—there is little doubt that Defendant was in custody, albeit for a lawful reason. *See United States v. Kruger*, 151 F.Supp.2d 86 (D.Me. 2001). Three officers were closely watching Defendant in his living quarters, asking him questions, and "investigating" what he might be hiding. The officers had taken active steps to restrict and monitor Defendant's movement and to isolate him, as well as to control the movements of other occupants.[18] Given the officer's call for a canine unit, a reasonable person should have believed that he would remain in their custody at least until they were satisfied that no drugs were present on the premises. Nothing about the environment would have indicated to a reasonable person that the police presence would abate in the near future or that Defendant was free to leave the apartment. Although the short amount of time that transpired and evidence that Defendant acquiesced to the officers' presence in the apartment mitigate against a finding of custody, it was clear by an objective standard that the

officers would not have let Defendant go into the apartment alone.

The officers' restriction of Defendant's movement transformed the otherwise neutral environment of Ms. Chandler's apartment into one of police control. "[S]uch control, albeit for legitimate purpose, [*e.g.*, for the safety of the officers,] may result in a finding that a suspect is in custody." *United States v. Bunnell*, 106 F.Supp.2d 60, 67 (D.Me.2000). The overall circumstances did not allow Defendant to leave the living room or terminate the questioning. In considering the character and duration of the interrogation, this Court has found that "[p]rolonged, accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *Bunnell*, 106 F.Supp.2d at 68. Although Defendant was previously told that he was not under arrest, he was never told that he was free to leave or that he could refuse to answer questions. Thus, while the Government has established good reason for the officers to continue to detain Defendant for further investigation as to whether he was involved in criminal activity, it is unquestionably true that, in doing so, he was placed in a state of custody. They were then going beyond in their investigative inquiry the purpose which created the basis for the exception to the requirements of *Miranda*: to obtain reliable, credible information to establish Defendant's identity. The exception vanished when their pursuit diverged to an inquiry as to whether Defendant was engaged in criminal conduct (*e.g.*, what it was that Lt. Roth

---

18. The officers stayed close to Defendant; Lt. Roth testified that they followed him into the house, through the kitchen and into the living room, where they remained during the course of events that evening. Tr. at 21, 44. Officer Burns testified that Defendant was between Lt. Roth and himself while Defendant was searching his bags in the living room. Tr. at

79. Officer Stanton testified that Defendant was between the three officers when the gun was found. Tr. at 95. Officer Stanton also testified that he was keeping an eye on Mr. Moody. Tr. at 92. Ms. Chandler testified credibly that she asked and received the officers' permission before returning upstairs. Tr. at 155.

thought that Defendant was hiding). Once that divergence occurred, the officers could not pursue the new line of inquiry, because Defendant was in custody, without administering the *Miranda* warning. There is a difference between the officers' right to maintain the detention for further legitimate purposes and whether they could pursue the new line of investigation without administering a *Miranda* warning to Defendant. The Court **CONCLUDES** that while the detention could legitimately be maintained, the *Miranda* warning was required before the questions about what Defendant was hiding could be put to him. The Court **CONCLUDES** that the statements Defendant made at the apartment, including that the living room was where he stayed and that he was a felon, were the result of custodial interrogation without the benefit of *Miranda* warnings, and they will, therefore, be suppressed.

### 3. Thomas's Statements Upon Sight and Seizure of the Evidence

■ Once the gun was spotted by Lt. Roth, he asked Defendant two questions: "What is this?" and "Is it loaded?" Defendant answered that it was a gun and that it was loaded. Defendant argues that these statements resulted from custodial interrogation and that they directly resulted from the unlawful discovery of the firearm. The Government responds that Defendant was not yet in custody and, even if he were in custody, these statements should not be suppressed because the public safety exception should apply here to the questions and answers regarding the gun and whether it was loaded. *New York v. Quarles*, 467 U.S. 649, 655–56, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *United States v. Shea*, 150 F.3d 44, 48 (1st Cir.1998) (defendant's answer to agent's pre-*Miranda* question whether he had any weapons was admissible under public safety exception). Because, when he saw the gun, Lt. Roth

knew or had reason to believe that Defendant was a felon, the Court **FINDS** that Lt. Roth's questions subjected Defendant to custodial interrogation, and that, at this point, Defendant was entitled to *Miranda* warnings unless some exception justified the questioning.

Defendant argues that the public safety exception should not apply where his answers did not "at least possibly enhance public safety ... [because] any answer from Thomas would not have changed Lt. Roth's actions and therefore could not have enhanced anyone['s] safety." Defendant's Post–Hearing Brief (Docket No. 19) at 13. Defendant continues that because Lt. Roth testified that he was a firearms instructor, that he knew the firearm was in fact a firearm, and that he was going to treat it as a loaded firearm no matter how Thomas responded to his questions, the application of the public safety exception is prevented. *Id.* at 13 (*citing* Tr. at 3, 26 & 54). The Supreme Court's *Quarles* holding carves out a public safety exception that applies to a Defendant who is questioned while in custody, where circumstances present an imminent danger to the public safety. *Quarles*, 467 U.S. at 655–56, 104 S.Ct. 2626. The public safety exception affords an opportunity for the officers to take custody of the weapon in the safest possible manner, which may include asking Defendant whether or not it is loaded.

The Government's analysis is inapposite here. *Quarles* is factually distinguishable because the order of events in that case, *i.e.*, that the statements led to the gun, was the reverse of the situation here. The officers in *Quarles* knew there was a weapon and they didn't know its location—the exigent circumstances plainly justified the inquiry in that case to protect the safety of the officers and the public. In this case, the sight of the gun prompted the statements. Lt. Roth's words, by his own ad-

mission, were rhetorical. Tr. at 67–69. Lt. Roth also testified that he would have seized the gun and handled it in the same manner regardless of Defendant's response to the inquiry as to whether or not it was loaded. Tr. at 66–68. Therefore, Lt. Roth's questions did not enhance public safety. They did, however, elicit incriminating responses.

Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). By the time Defendant answered Lt. Roth's questions regarding the gun, Lt. Roth knew or had strong reason to believe that Defendant was a felon. This made immediately apparent the incriminating nature of the gun and, therefore, of questions about the gun. Furthermore, unlike in *Quarles*, there was no imminent threat because Defendant had moved away from the bag and Lt. Roth was in the process of reaching for it when he said, "What's this?," and Lt. Roth had already picked it up when he asked whether it was loaded.

In *Shea*, 150 F.3d at 48, the Court of Appeals for the First Circuit recognized that asking a suspect if he is armed goes up to the line but does not go outside permissible *Quarles* inquiry because the "question would have facilitated the securing of any weapons on Shea's person whether or not the agent intended to conduct a search of the suspect." This is not that case. Whereas the officers in *Shea* did not know whether or not the suspect

was armed, Lt. Roth testified that he knew immediately what the gun was when he saw it, and would not have acted any differently in the absence of information about it being loaded. Similarly, in *Quarles*, the exigency of awareness of a lingering threat led to the challenged conduct. Lt. Roth admitted that a suspect's claim that a gun is unloaded produces no less of a threat than getting no information from a suspect because Lt. Roth does not "take someone's response too seriously." Tr. at 66–67. The Court **CONCLUDES** that the public safety exception does not apply to Defendants' statements about the gun, upon its discovery, and the statements will be suppressed.

### 4. Thomas's Statements to Officer Randy St. Laurent

 Defendant argues that his statements made to Officer St. Laurent at the Androscoggin County Jail were the result of the unlawful discovery of the firearm and prior *Miranda* violations and that they should, therefore, be suppressed. Defendant contends that the *Miranda* warnings concededly given at the jail do not remove the taint of the prior illegal search and the interrogation about the gun in violation of *Miranda*. The Government argues that, even though Defendant was in custody, all of his statements were otherwise voluntary and, therefore, that the exclusionary rule does not apply. But here, where the prior Constitutional violation is an improper search, the "fruit of the poisonous tree" doctrine outlined in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), governs evidence discovered as a direct result of the unlawful search.[19] The holding of

---

19. Were the only Constitutional violation up to this point the failure to administer *Miranda* warnings in the course of custodial interrogation, the Government is arguably correct that

Defendant's subsequent voluntary statements to Officer St. Laurent, after proper *Miranda* warnings, might be admissible. *But see, United States v. Kruger*, 151 F.Supp.2d 86 (D.Me.

*Wong Sun* dictates application of the exclusionary rule to evidence discovered as a result of a search in violation of the Fourth Amendment, whether it is tangible, physical evidence or a subsequent confession. *Oregon v. Elstad,* 470 U.S. 298, 305–06, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985).

In *United States v. Campa,* 234 F.3d 733 (1st Cir.2000), the Court of Appeals for the First Circuit held that an unlawful frisk, where officers removed Defendant's wallet from his pocket, did not taint Defendant's subsequent arrest based on his later voluntary production of a counterfeit driver's license. "[O]ur cases make clear that evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence. Suppression is not justified unless 'the challenged evidence is in some sense the product of illegal government activity.'" *Id.* 234 F.3d at 740 (*quoting Segura v. United States,* 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (citation omitted)). Here, both parties stipulated that Defendant's statements to Agent St. Laurent were made after "proper and sufficient" *Miranda* warnings had been administered. Tr. at 106–07. The Court **FINDS** that, although Defendant waived his *Miranda* rights after proper warnings at the Androscoggin County Jail, the illegal discovery of the gun was the "but for" cause of his arrest and of this post-*Miranda* confession. Therefore, the Court **CONCLUDES** that Defendants later statements to Officer St. Laurent, though voluntarily made, were the "product of illegal government

activity" and that the exclusionary rule applies. Defendant's statements made at the Androscoggin County Jail after his arrest are inadmissible and will, therefore, be suppressed.

### III. CONCLUSION

Accordingly, the Court **ORDERS** that Defendants' Motion to Suppress be, and it is hereby, **GRANTED** in part (as to the firearm and to the statements made prior to his arrest at the apartment, the answers to the questions about the gun, and the post-arrest statements made to Agent St. Laurent), and **DENIED** in part (as to the statements made at the Lake District area).

2001) (holding that after *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), violation of *Miranda* renders the fruits of the improper questioning a violation of constitutional dimension which requires suppression of them as "fruits of the poisonous tree" under the doctrine of *Wong Sun* ). The decision in *Kruger* has not been, and will not be, subjected to appellate review

because the case has been dismissed due to the death of the Defendant in the course of the prosecution.

Here the Court renders no decision as to whether in the circumstances of this case, the violation of *Miranda* in respect to the questioning about the gun would alone require suppression of the fruits of the post-*Miranda* questioning under the doctrine of *Wong Sun.*