# United States Court of Appeals
## For the First Circuit

No. 02-2135

UNITED STATES,

Appellant,

v.

ERNEST B. WEIDUL,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]
[Hon. David M. Cohen, U.S. Magistrate Judge]

Before

Lynch, Circuit Judge,

Bownes, Senior Circuit Judge,

and Howard, Circuit Judge.

F. Mark Terison, Senior Litigation Counsel, with whom Paula D. Silsby, United States Attorney, were on brief for appellant.
David R. Beneman with whom Levenson, Vickerson & Beneman was on brief for appellee.

March 31, 2003

**Bownes**, **Senior Circuit Judge**.  The defendant-appellee, Ernest Weidul ("Weidul"), was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  The police found the firearm after conducting a warrantless search of the home of Trisha Malloch ("Malloch"), Weidul's fiancee.  Weidul moved to suppress the firearm.  A Magistrate Judge found that Malloch did not voluntarily consent to the search of her home and recommended that Weidul's motion be granted.  The district court adopted the Magistrate Judge's recommendation and granted the motion to suppress.  The government appealed.  We affirm.

## I.  BACKGROUND

We take the facts from the Magistrate-Judge's recommended decision, which the district court adopted.  See United States v. Weidul, 227 F. Supp.2d 161, 162-65 (D. Me. 2002).  When motions to suppress are at issue, we review a district court's factual findings for clear error.  See United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000).  The ultimate conclusion as to whether there is a Fourth Amendment violation is reviewed de novo.  See Ornelas v. United States, 517 U.S. 690, 691 (1996).

On the evening of January 11, 2001, Weidul called the emergency department of Southern Maine Medical Center ("SMMC") and threatened to "blow his head off" with a loaded .22 caliber gun.  The crisis-response worker who answered Weidul's phone call overheard a female voice in the background screaming, "Oh my God,

don't do it, don't do it." The crisis-response worker asked Weidul to identify the person yelling and he replied that it was his fiancee, Malloch. Weidul refused to let the crisis-response worker speak with Malloch. The worker also observed that Weidul was slurring his words and seemed to be intoxicated. Following protocol, the crisis-response worker signaled for her colleague to phone the police.

The colleague ascertained that the call was coming from a residence in Kennebunk, Maine, and phoned the Kennebunk Police Department. She told the police dispatcher that Weidul was suicidal, had a loaded gun in his hand "two inches from his mouth," had been drinking, had two boxes of ammunition, and was threatening to shoot police officers. She also reported that Weidul was at Malloch's home and that Weidul refused to let Malloch speak with the crisis-response workers.[1] After five minutes, Weidul repeated that there was nothing that could stop him from killing himself and hung up the phone.

While officers were en route to Malloch's residence, the Kennebunk police dispatcher received a phone call from Malloch. Malloch reported that Weidul had passed out and was asleep, that

---

[1] It can be inferred from the record that Weidul was staying or living with Malloch. Therefore, he had an expectation of privacy in her home and standing to challenge the warrantless search. See Minnesota v. Olson, 495 U.S. 91, 99-100 (1990) (overnight guests have a legitimate expectation of privacy in their host's home).

there was no gun involved, that Weidul was just a little depressed, and there was nothing more to the situation. The dispatcher, who was in simultaneous communication with the officers en route, asked Malloch to meet the officers outside her home and she obliged.

One of the officers, Keith Mills ("Mills"), knew Weidul from two previous domestic violence incidents in which he had threatened to shoot his mother and sister, and had assaulted his father and sister. Mills considered Weidul to have a "propensity for violence" and knew that he had a history of mental instability. Another officer, Zachary Brooks Harmon ("Harmon"), recalled an incident in July, 2000, when Weidul pointed a gun at Malloch. Both officers considered Weidul to be very dangerous. Mills also knew Malloch from her work in Kennebunkport and from minor traffic stops. Harmon knew Malloch from her previous traffic infractions and chance encounters. He characterized her as a "cop nut" who was fascinated by the police.

When the officers arrived at the scene, they met Malloch who was outside her house. They spoke to Malloch as they went into the house and asked her where both Weidul and the gun were located. Malloch cooperated with police by telling them that Weidul was upstairs sleeping in the bedroom; she did not protest them entering her home. She did, however, deny that there was a gun in the house.

The officers found Weidul upstairs, but found no weapon. They

-4-

did, however, observe a gun cleaning kit on the right side of the bed, along with a small, uncovered plastic box containing medication bottles and .22 caliber ammunition. Weidul was lying on the bed, apparently asleep. The police officers put plastic "flexcuffs" on Weidul and placed him in a waiting patrol car, which immediately departed from the Malloch residence to SMMC.

Harmon, Mills, and another officer re-entered Malloch's home. Malloch was in her downstairs' living room, sitting in an armchair speaking to Kennebunk police captain, Mike LeBlanc ("LeBlanc"). The substance of the conversation between Malloch and LeBlanc is not in the record. LeBlanc had arrived on the scene at some time subsequent to the other officers. A fifth officer was also present. In Malloch's presence, LeBlanc instructed the officers to make sure, for safety reasons, that there were no weapons in the house. Malloch, still sitting in her armchair, did not protest. To Harmon, she appeared "blase" and unconcerned that a search was transpiring. Mills began looking around the living room and noticed ammunition rounds in plain view on shelves and on the floor next to the chair where Malloch was sitting. He found no weapons in the living room.

Harmon proceeded from the living room toward the kitchen, saying to Malloch, "I'm going to look in here, okay?" Malloch gave no response. Harmon nonetheless entered the kitchen. After a few moments in the kitchen, Harmon moved on to a small laundry room

adjacent to the kitchen, telling Malloch, whom he could still see, "I'm going to look in here." Malloch responded, "Okay." Harmon entered the laundry room. The floor was littered with dirty clothes. Harmon kicked aside some of the clothes and discovered a loaded .22 caliber handgun, the object of the motion to suppress. The officers continued to search the house for an hour after Harmon found the gun.

## II. DISCUSSION

The primary issue in this case is whether Malloch voluntarily gave consent for the police to conduct a warrantless search of her home. No claim is made that this search is warranted by exigent circumstances. The government initially raises a question about the proper standard of appellate review. It argues that whether Malloch voluntarily gave consent to the search of her home is a question of law that we should review de novo. Our rule has been that voluntariness of consent is a factual matter that is subjected to the clear error standard of review, and we adhere to that rule. See United States v. Laine, 270 F.3d 71, 74 (1st Cir. 2001); United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001); United States v. Barnett, 989 F.2d 546, 554 (1st Cir. 1993). Under this standard, a district court's choice between two plausible competing interpretations of the facts cannot be clearly erroneous. See Palmer, 203 F.3d at 60. Instead, "the only real question for appellate review is whether the evidence presented at the

suppression hearing fairly supports [the district court's] finding." Laine, 270 F.3d at 75.

Turning to the merits, "warrantless search and seizures in the home violate the Fourth Amendment, absent consent or exigent circumstances." Griffin v. Wisconsin, 483 U.S. 868, 883 (1987) (Blackmun, J., dissenting). Consent must be voluntary to be valid. See United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000). Whether consent is voluntary is to be determined by examining the totality of the circumstances, including the interaction between the police and the person alleged to have given consent. See United States v. Esquilin, 208 F.3d 315, 318 (1st Cir. 2000); Perez-Montanez, 202 F.3d at 438.

The heart of the government's argument is that Malloch voluntarily consented to the search when she responded "Okay" to Officer Harmon's statement, "I'm going to look in here." The government argues that the totality of the circumstances demonstrate Malloch's "Okay" was voluntary consent. These circumstances include the fact that Malloch was sitting in a chair in her living room; that Malloch was a "cop nut" and was fascinated by the police; the fact that Malloch had met Officer Harmon on a prior occasion; the fact that Malloch's demeanor was low-key; and the fact that Malloch did not protest when Captain LeBlanc told the other officers to search the house for weapons.

The Magistrate Judge examined the totality of the

-7-

circumstances and found that Malloch did not voluntarily consent to the search of her home.  The Magistrate Judge held:

> Under all of these circumstances, Malloch's uttering of the word "okay" as Harmon stated that he was about to search the laundry room (meanwhile walking purposefully in that direction) was not a consent to search--it was a simple acquiescence to what any reasonable person would have perceived, under the circumstances, as police conduct tantamount to a claim of lawful authority to search for weapons.

Weidul, 227 F. Supp.2d at 167-68.

We rule that the evidence fairly supports the Magistrate Judge's finding.  The critical facts are as follows.  After Weidul was removed from the house, Officer Harmon and two other officers re-entered Malloch's home without permission.  Once inside, they found Malloch talking with Captain Leblanc.  A fifth officer was also present.  In Malloch's presence, Leblanc told the other officers that they had to search Malloch's house for weapons.  Malloch sat in a chair as the officers dispersed to search her house.  Officer Harmon asked Malloch if he could look in the kitchen, but she did not respond.  Harmon nevertheless entered the kitchen.  Harmon then told Malloch that he was going to look in the laundry room.  Malloch responded "Okay."

### III.  CONCLUSION

The Magistrate Judge's factual findings on the voluntariness of Malloch's consent are fairly supported by the record.  The government merely offers evidence from which an alternative conclusion can be drawn.  This is not enough under the clearly

-8-

erroneous standard of review.  See United States v. Coraine, 198 F.3d 306, 310 (1st Cir. 1999).  Absent voluntary consent, this search violated the Fourth Amendment.  Affirmed.