# United States Court of Appeals
## For the First Circuit

No. 04-1297

UNITED STATES OF AMERICA,

Appellee,

v.

CARL S. ROMAIN, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Selya, Circuit Judge,

Stahl and Leval,* Senior Circuit Judges.

Syrie D. Fried, Federal Defender Office, for appellant.
Virginia M. Vander Jagt, Assistant United States Attorney,
with whom Michael J. Sullivan, United States Attorney, was on
brief, for appellee.

December 29, 2004

_____

*Of the Second Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  Faced with criminal charges related to his possession of a firearm and ammunition, defendant-appellant Carl S. Romain, Jr. moved to suppress those artifacts. After the district court denied his motion, the appellant entered a conditional guilty plea, reserving the right to challenge that order.  He now appeals, importuning us to hold that the police obtained the firearm and ammunition in violation of his Fourth Amendment rights.

In mounting this challenge, the appellant contests the constitutionality both of the officers' entry onto certain premises and of their ensuing actions.  The record, however, adequately supports the lower court's conclusion that the officers were lawfully on the premises pursuant to the principal occupant's consent and that they seized the incriminating articles in the course of a permissible security frisk.  Consequently, we uphold the denial of the motion to suppress and affirm the appellant's conviction and sentence.

## I.  BACKGROUND

In reviewing the denial of a motion to suppress, "[w]e recount the relevant facts as the trial court found them, consistent with record support."  United States v. Lee, 317 F.3d 26, 30 (1st Cir. 2003).

On the evening of October 19, 2002, a 911 emergency operator fielded a call from a woman who exclaimed that "someone's

in here with a gun.  I was visiting here with my friend, and he's in here with a gun."  When the operator inquired whether the woman was placing the call surreptitiously, the woman responded by asking that the call be traced.

A police dispatcher sent Officers Martin O'Malley and Joseph Garcia to the location whence the call originated.  The dispatcher told the officers that he was "getting a call at 65 Lonsdale, third floor.  The female says there's a man in their apartment there with a gun . . . allegedly armed with a handgun there."  According to Officer O'Malley, the dispatcher explained that the caller was "very evasive on the phone and was pretending as if she was talking with a friend."

Because the dispatcher gave the assignment "Priority 1" status, the officers hastened to the Lonsdale Street address. Officer Emanuel Damberville joined them there.  Officer Garcia went to the back of the building while his confreres climbed the stairs to the third floor.  The police knocked at the front door of the third-floor flat and two women opened the door.  The officers explained why they were there and inquired whether there was anyone with a gun in the apartment.  One of the women, later identified as Annsyya Jones, replied in the negative.  The other woman, later identified as Margaret Jones, nodded affirmatively.

The officers then asked whether they could take a look inside the apartment.  The women responded that they did not mind

and welcomed the officers inside. The officers did not know at that time who the women were or how they came to be on the premises (although it was subsequently determined that Annsyya Jones was the tenant and that Margaret Jones was a visitor).

Almost immediately after the policemen entered, the appellant emerged from a bedroom and demanded to know why they were there. Officer O'Malley explained that the police had received a radio call and asked whether the appellant was carrying a gun. The appellant replied in the negative but, apparently aggravated by the officers' presence, began to flail his arms and shout: "What are you doing here? What do you want?" Then the appellant, who was "visibly agitated," strode into Officer O'Malley "as if he [were] trying to walk through [him]." The officer responded by seizing the appellant and placing him against a nearby wall. When asked again whether he was armed, the appellant repeated that he was not.

Leaving Officer Damberville to watch the appellant, Officer O'Malley went to see what he could learn from the two women. He took Margaret Jones into the kitchen and asked whether she had placed the 911 call. She told him that she had and that the man whom the officers had encountered was carrying a firearm in the front of his pants. When Officer O'Malley continued his questioning, she remained adamant that the appellant had a gun in his waistband.

Officer O'Malley returned to the appellant and asked for a third time whether he was carrying a firearm. After receiving a negative response, the officer performed a pat-down, starting at the appellant's waist. Feeling what he believed to be a firearm, he lifted the appellant's sweatshirt and observed the butt of a gun. The appellant attempted to pull away, provoking a struggle. At that juncture, Officer Garcia entered the apartment and helped his colleagues subdue the appellant. The officers retrieved a .32 caliber automatic, loaded with six bullets, from the front of the appellant's pants.

In short order, the police arrested the appellant, ascertained that he had no license to carry the gun, and transported him to the station house for booking.

## II.  TRAVEL OF THE CASE

In due season, a federal grand jury charged the appellant with being a felon in possession of a firearm and ammunition and with possession of the same articles while being subject to a domestic restraining order. See 18 U.S.C. §§ 922(g)(1), 922(g)(8). The appellant moved to suppress the firearm and the ammunition, contending (i) that the police had unlawfully entered the apartment, and (ii) that, even if the entry was lawful, the 911 call amounted to no more than an anonymous, uncorroborated tip, which did not supply reasonable, articulable suspicion sufficient

-5-

to bring the ensuing detention and frisk within the constitutional pale.

The district court held an evidentiary hearing at which both Officer O'Malley and the appellant testified. The court credited the former's testimony "in every material particular." Predicated on that testimony, the court impliedly found consent to enter the apartment and explicitly found that the collocation of circumstances, including the 911 call, Margaret Jones's affirmative nod in response to Officer O'Malley's initial query about the presence of an armed man in the apartment, and the appellant's aggressive behavior when the police arrived, combined to justify the temporary detention. The court then found that those facts, augmented by the information gleaned during the officer's private interview with Margaret Jones, justified the protective frisk. Based on those findings, the court denied the motion to suppress.[1]

The appellant subsequently entered a conditional guilty plea, see Fed. R. Crim. P. 11(a)(2), reserving the right to seek appellate review of the suppression order. After the court imposed a 180-month incarcerative term, the appellant prosecuted the instant appeal.

---

[1]The appellant also moved to suppress certain statements that he had made after his arrest but before receiving Miranda warnings. See Miranda v. Arizona, 384 U.S. 436, 479 (1966). The district court excluded those statements and the government has not contested that disposition.

**III.  ANALYSIS**

The appellant's asseverational array breaks down into two discrete segments involving (i) the officers' entry into the apartment and (ii) the temporary detention and frisk that ensued. We consider each segment in turn, accepting the district court's findings of fact to the extent they are not clearly erroneous and subjecting its legal conclusions to de novo review.  See United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).

### A.  **The Entry**.

The Fourth Amendment does not protect privacy in any and all circumstances.  Among other limitations, a criminal defendant who wishes to embark upon a Fourth Amendment challenge "must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized."  United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988).  Although the usage is imprecise, see Rakas v. Illinois, 439 U.S. 128, 138-40 (1978), courts frequently refer to this threshold requirement as implicating "standing," see, e.g., Aguirre, 839 F.2d at 856-57. For simplicity's sake, we shall adopt that nomenclature here.

Inasmuch as a criminal defendant cannot challenge a search or seizure unless and until he has crossed the "standing" threshold, we preface our discussion of the appellant's claim that the officers' entry into the apartment violated his Fourth Amendment rights with a few words about his standing.  Following

-7-

that discourse, we proceed to chart the remainder of the relevant legal landscape and apply the discerned principles to the facts.

Relying on the Supreme Court's decision in Minnesota v. Olson, 495 U.S. 91 (1990), the appellant posits that his status as a fairly regular overnight guest in the apartment gave him a reasonable expectation of privacy within its confines (and, therefore, that he has standing to mount a Fourth Amendment challenge to the officers' entry). We accept that argument for two reasons.

First, although the government disputed the appellant's standing in its opposition to his motion to suppress, it has not rekindled that dispute on appeal. An appellate court is free to deem abandoned claims or defenses that the government (or any other litigant, for that matter) fails to argue. See United States v. Rodriguez-Marrero, 390 F.3d 1, ___ (1st Cir. 2004) [No. 01-1647, slip op. at 32]; United States v. Caraballo-Cruz, 52 F.3d 390, 393 (1st Cir. 1995). The government has, therefore, effectively conceded the existence of standing.

Second, the district court credited the appellant's testimony as to the frequency and duration of his visits to the apartment and made findings of fact to the effect that the appellant had keys to the flat and was there on the evening in question as an overnight guest. These findings are unimpugnable, and they bring the appellant squarely within the rule that an

-8-

overnight guest has a legitimate expectation of privacy in his host's abode. Olson, 495 U.S. at 98. Consequently, even apart from the government's implied concession, it appears that the appellant has standing to challenge the officers' entry into the apartment.

We next consider the legal principles applicable to the entry. The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless police entry into a residence is presumptively unreasonable unless it falls within the compass of one of a few well-delineated exceptions. See United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999). One such exception is for a consensual entry. United States v. Laine, 270 F.3d 71, 74-75 (1st Cir. 2001). The government bears the burden of demonstrating that consent was validly obtained. Id. at 75. This entails a showing that an appropriate person voluntarily gave a valid consent. See id.

Typically, whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); Laine, 270 F.3d at 75. For that reason, a finding of voluntary consent (other than one based on an erroneous legal standard) is reviewable only for clear error, Laine, 270 F.3d at 74, and the trial court's credibility determinations ordinarily must be respected, United States v. Marshall, 348 F.3d 281, 286

(1st Cir. 2003). The operative inquiry is whether the evidence presented at the suppression hearing fairly supports the court's finding with respect to voluntary consent. Laine, 270 F.3d at 75. In formulating our answer to this inquiry, "a district court's choice between two plausible competing interpretations of the facts cannot be clearly erroneous." United States v. Weidul, 325 F.3d 50, 53 (1st Cir. 2003).

In this case, the government presented competent evidence of a consensual entry. Officer O'Malley testified that both Annsyya and Margaret Jones responded to his request to look around the flat by "welcom[ing] us into the apartment" (we focus herein on Annsyya, because she was the principal occupant of the apartment and, therefore, a person plainly authorized to give valid consent).[2] When cross-examined, the officer reiterated that he "actually asked them if we could come in the apartment and they welcomed us in." The district court credited Officer O'Malley's testimony "in every material particular." Since this testimony is

---

[2]The appellant argues vociferously that any consent by Margaret Jones would be irrelevant because, as a mere guest with no proprietary interest in the residence, she lacked authority to give consent. Since we discern no clear error in the district court's implied finding that Annsyya Jones consented to the entry, we need not determine the relevance of Margaret Jones's alleged consent. For clarity's sake, however, we note that actual authority is not necessarily the sole focus of the voluntary consent inquiry; apparent authority can support a finding of consent as long as the officer reasonably believed that the person giving consent was authorized to do so. See Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); Marshall, 348 F.3d at 285.

plausible on its face and not inconsistent with the other information that is known about the events in question, the district court's finding warrants our approbation. See, e.g., United States v. Del Rosario, 388 F.3d 1, 12 (1st Cir. 2004).

The appellant maintains that our decision in United States v. Weidul demands a different result. There, we affirmed the trial court's finding that there was no voluntary consent. Weidul, 325 F.3d at 54. The appellant argues that the circumstances were similar and, thus, that the trial court in this case clearly erred in drawing an opposite conclusion. We disagree for two reasons. First, the facts as supportably found by the trial courts in the two cases are significantly different. Second, the appellant's argument totally overlooks the standard of review.

In Weidul, the defendant called medical emergency services, reported that he had a gun to his head, and proclaimed that he was about to commit suicide. Id. at 52. The call had originated from the home of the defendant's fiancée and police officers were dispatched to that locus. Id. While the officers were in transit, the fiancée telephoned the police dispatcher, announced that the situation had been diffused, and indicated that no help was needed. Id. The police nevertheless proceeded to the scene and, with the fiancée's cooperation, entered her home and removed the defendant. Id. After arranging for his transportation to a hospital, the officers reentered the home without permission.

-11-

Once inside, they persisted in a room-by-room search.  <u>Id.</u> at 52-53.

On these facts, the district court found that the fiancée had not voluntarily consented to the search and, therefore, suppressed the evidence seized.  <u>Id.</u> at 51, 54.  We affirmed on the basis that the lower court's factual findings were "fairly supported by the record" and that the government's evidence favoring the opposite conclusion (for example, that the fiancée had said "okay" or remained mute when the police, after effecting the unauthorized reentry, inquired about searching particular rooms) did not suffice to render those findings clearly erroneous.  <u>Id.</u> at 54.

Leaving to one side that the facts of <u>Weidul</u> are plainly distinguishable from those of the instant case, that decision does not help the appellant.  Assuming the trial court's use of correct legal principles, the proper office of an appellate court reviewing the grant or denial of a motion to suppress is not to decide whether it, if sitting in the trial court's stead, might have reached a contrary conclusion, but, rather, to decide whether the trial court's factual findings derive adequate support from the record.  <u>See</u> <u>United States</u> v. <u>Rutkowski</u>, 877 F.2d 139, 144 (1st Cir. 1989); <u>see</u> <u>also</u> <u>Reliance Steel Prods. Co.</u> v. <u>Nat'l Fire Ins. Co.</u>, 880 F.2d 575, 576 (1st Cir. 1989) (noting that factfinding and credibility determinations are "the staples of a trial court's

-12-

diet"). Exercising that office, the <u>Weidul</u> court held that, on the facts of record, a "no consent" finding was not clearly erroneous. We exercise the same office, and there is no discrepancy between the <u>Weidul</u> court's decision and the decision that we reach today.

In a final effort to scotch the possibility of a consensual entry, the appellant notes that the lower court never made an express finding that Annsyya Jones validly consented to the entry. That is true as far as it goes — but it does not take the appellant very far. The law does not require trial courts to render encyclopedic decisions.

This case is a good example. Officer O'Malley testified that the two women consented to the officers' entry and welcomed them into the flat. The trial judge credited Officer O'Malley's testimony explicitly and unreservedly. The most logical inference, then, is that the judge concluded that Annsyya Jones had consented to the entry. No more is exigible to allow us to treat the court's decision as premised upon that finding.

That ends this aspect of the matter. The district court's implied finding that Annsyya Jones voluntarily consented to the gendarmes' entrance into her apartment validates the entry and eliminates the need for some other constitutionally acceptable justification (say, a search warrant). We hold, therefore, that the officers' entry into the apartment was not in violation of the Fourth Amendment.

### B. **The Temporary Detention and Frisk**.

The appellant maintains that even if the officers' entry into the apartment passed constitutional muster, they lacked lawful authority to detain him and perform a frisk for weapons. This line of argument redirects our analytic course to the law governing the search and seizure of persons.

A temporary detention of an individual constitutes a seizure within the purview of the Fourth Amendment and, therefore, is subject to the constitutional imperative that it must be reasonable under all the circumstances. See Terry v. Ohio, 392 U.S. 1, 16, 19 (1968); Lee, 317 F.3d at 31. The Terry Court established the baseline rule, holding that an officer may conduct a brief investigatory stop if he has a reasonable, articulable suspicion that criminal activity is afoot. See Terry, 392 U.S. at 30. Although the showing required to meet this standard is considerably less demanding than that required to make out probable cause, the officer nonetheless must possess (and be able to articulate) more than a hunch, an intuition, or a desultory inkling of possible criminal activity. See id. at 27.

A court inquiring into the validity of a Terry stop must use a wide lens and survey the totality of the circumstances. See United States v. Sokolow, 490 U.S. 1, 8 (1989). The inquiry must consider "whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were

fairly responsive to the emerging tableau." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). Generally speaking, a stop is justified at its inception if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Terry, 392 U.S. at 21; see United States v. Young, 105 F.3d 1, 7 (1st Cir. 1997).

Police officers are not limited to personal observations in conducting investigatory activities, and reasonable suspicion for a Terry stop may be based on information furnished by others. See Adams v. Williams, 407 U.S. 143, 147 (1972). That does not mean, however, that an officer may indiscriminately credit gossip or innuendo. An officer may rely upon an informant's tip to establish reasonable suspicion only if the information carries "sufficient 'indicia of reliability'" to warrant acting upon it. Alabama v. White, 496 U.S. 325, 328 (1990) (quoting Adams, 407 U.S. at 147). That determination entails an examination of all the circumstances bearing upon the tip itself and the tipster's veracity, reliability, and basis of knowledge. See id. at 328-29.

The propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold. See Chhien, 266 F.3d at 6. The touchstone is reasonableness. Thus, in determining whether a pat-down search is an appropriate step following a valid Terry stop, the key is

-15-

whether, under the circumstances, "the officer is justified in believing that the person is armed and dangerous to the officer or others." United States v. Schiavo, 29 F.3d 6, 8 (1st Cir. 1994).

With these tenets in mind, we rehearse the facts known to the officers, as well as those that they reasonably could have inferred, at the time they placed the appellant against the wall. We proceed from there to the facts known or inferable at the time of the pat-down.

The officers received information from the dispatcher that a 911 caller had reported that she was inside an apartment with an armed man. The emergency nature of a 911 call supported a reasonable inference that the woman felt threatened by her situation and desired police protection; the dispatcher's comment that the woman was pretending to be talking to a friend supported a further inference that the circumstances prevented her from providing a full picture of the peril presented by the man with the gun.

When the officers reached the premises, one of the two women who opened the door confirmed that an armed man was inside. The fact that this was done by a nod rather than by a declarative statement does not divest it of significance; the woman's gesture provided face-to-face corroboration of the essence of the 911 report, and her unwillingness to vocalize lent credence to the

-16-

possibility that she faced some kind of threat that inhibited her from speaking aloud.

When the officers entered the flat, a man materialized from another room, flew into a rage, and charged toward them. His presence in the apartment made it highly likely that he was the man reported to be carrying a firearm. His belligerence, combined with the initial tip, gave rise to a reasonable suspicion that he might have been involved in criminal wrongdoing (say, menacing the occupants of the apartment) as well as a reasonable concern for the officers' safety.

It is common ground that "[e]valuating whether an officer's suspicions are (or are not) reasonable is a fact-sensitive task, bound up in the warp and woof of the surrounding circumstances." Chhien, 266 F.3d at 8. As such, some "[d]eference is due to the experienced perceptions of the officers." United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000). Ceding that deference here, we conclude, without serious question, that the temporary detention — placing the appellant up against the wall — was justified at its inception because the officers had a reasonable suspicion that the appellant was armed and had acted in such a way as to threaten the person who placed the 911 call.

Having concluded that the officers were warranted in briefly detaining the "visibly agitated" man (whom they reasonably suspected of carrying a gun) in order to investigate the situation

further, we next consider the frisk.  In addressing this point, it is important to recall that Officer O'Malley's private audience with Margaret Jones yielded several nuggets of information:  that she had placed the 911 call; that the man whom the police had detained was the man she had described as armed in that call; and that the gun was in the waistband of the man's pants.  Having mined these nuggets and noted the appellant's frenetic behavior, the police had a plausible basis for suspecting that the appellant was armed and dangerous.  That, in turn, formed the basis for a reasonable belief that a frisk was necessary to protect the safety of both the civilians within the apartment and the officers themselves.  See, e.g., United States v. Taylor, 162 F.3d 12, 17 (1st Cir. 1998) (noting that, in the context of a valid Terry stop, a reasonable safety concern justifies disarming the suspect).

The frisk that Officer O'Malley subsequently conducted was restricted to the bare minimum needed to detect the presence of a firearm.  He began at the appellant's waist (where the informant had stated that the appellant kept his weapon) and went no further than to extract the gun.  This course of action was reasonable under the circumstances and, thus, constitutionally appropriate. See Terry, 392 U.S. at 26.

The appellant advances three counter-arguments in an effort to blunt the force of this reasoning.  None is persuasive.

-18-

First, the appellant attempts to attack the officers' evidentiary portfolio by characterizing Margaret Jones as an anonymous (and, thus, inherently unreliable) tipster. In pressing this attack, the appellant points out that the police did not know Margaret Jones before the occurrence of these events and that she remained nameless from the time of the 911 call until after the arrest. In the appellant's view, her continuing anonymity triggered an unmet requirement of independent corroboration.

The appellant bases this argument on the Supreme Court's decision in Florida v. J.L., 529 U.S. 266 (2000). But he reads that decision through rose-colored glasses. In J.L., the Court, discussing a tip that emanated from an "unknown caller" who phoned from an "unknown location" and offered no indication of the basis for the information provided, confirmed that such an anonymous tip, standing alone, seldom will exhibit sufficient indicia of reliability to support reasonable suspicion for an investigatory stop. See id. at 270. The Court took pains to contrast such a source with "a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." Id.

While this case falls somewhere between these two descriptions, Margaret Jones more closely resembles the latter example because the police confirmed that the caller was not merely communicating an anonymous tip of dubious reliability. She said

from the start that she was in an apartment with a man who had a gun, supporting a likelihood that she had seen the gun. And the manner in which she communicated the information on the telephone suggested a likelihood that she was concerned for her own safety. Thereafter, her willingness to reconfirm the accusation in person, under circumstances that might immediately reveal its truth or falsity, suggests a higher degree of reliability than a wholly anonymous telephone call (as to which the caller would suffer no adverse consequences if the police took action and the tip proved apocryphal).

Given these considerations, Margaret Jones's tip cannot plausibly be said to be anonymous and unreliable in the sense that concerned the J.L. Court. Unlike a faceless telephone communication from out of the blue, a face-to-face encounter can afford police the ability to assess many of the elements that are relevant to determining whether information is sufficiently reliable to warrant police action. See White, 496 U.S. at 328-29. A face-to-face encounter provides police officers the opportunity to perceive and evaluate personally an informant's mannerisms, expressions, and tone of voice (and, thus, to assess the informant's veracity more readily than could be done from a purely anonymous telephone tip). See, e.g., United States v. Heard, 367 F.3d 1275, 1279 (11th Cir. 2004); United States v. Campa, 234 F.3d 733, 738 (1st Cir. 2000). In-person communications also tend to be

more reliable because, having revealed one's physical appearance and location, the informant knows that she can be tracked down and held accountable if her assertions prove inaccurate. See J.L., 529 U.S. at 270-71. Finally, a face-to-face encounter often provides a window into an informant's represented basis of knowledge; for example, her physical presence at or near the scene of the reported events can confirm that she acquired her information through first-hand observation. See, e.g., United States v. Lewis, 40 F.3d 1325, 1334 (1st Cir. 1994).

In this case, the appellant would have us attach decretory significance to the fact that Margaret Jones was, at the times material hereto, anonymous — the officers did not learn her name until after they had made the arrest. This perspective gives an artificially literal meaning to the adjective "anonymous" and, in the bargain, mistakenly emphasizes the label rather than the contents of the package. The dispositive difference between this case and J.L. is that, here, the officers had in-person contacts with Margaret Jones, and those contacts, although limited, allowed them to gauge her veracity and to make some informed assessment of the reliability of the tip (e.g., her face-to-face reconfirmation and her presence in the apartment provided some assurance that her assertions were based upon first-hand knowledge).

In the last analysis, words are like chameleons; they frequently have different shades of meaning depending upon the

circumstances.  See, e.g., Hanover Ins. Co. v. United States, 880 F.2d 1503, 1504 (1st Cir. 1989).  The informant here was not "anonymous" as the J.L. Court employed that term and the information was not, as in J.L., a "tip" that had no discernible basis.  Hence, we agree with the district court that it was reasonable for the officers to rely on the as-yet-nameless informant's statements in making their Terry determinations.

The appellant next argues that a combination of two facts — that Officer O'Malley had a specific purpose (retrieving a gun) and a specific target (the waistband of the appellant's pants) — invalidates the protective frisk and converts it into a search for evidence (which would have had to have been justified by probable cause).

This is resupinate reasoning.  In determining whether an officer had reasonable suspicion to justify a Terry stop and protective frisk, the officer's subjective motives do not enter into the decisional calculus.  See Whren v. United States, 517 U.S. 806, 812 (1996); United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001).  The appellant has pointed to no relevant authority suggesting that a particular subjective motive alters the familiar focus of the Terry analysis, which is "the objective significance of the particular facts under all the circumstances." Woodrum, 202 F.3d at 7 (emphasis supplied). What is more, if the police conduct a Terry frisk justified by fear for their safety arising from

information about a gun in a person's waistband, the waist area is logically the first place that one would expect the officers to look.

If more were needed — and we doubt that it is — the Supreme Court has applied the Terry doctrine in reviewing a targeted frisk of a defendant's waistband. In Adams v. Williams, the Court concluded that a "policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety" and was reasonable under the circumstances. 407 U.S. at 148. It follows inexorably that Officer O'Malley's beeline to the place where he suspected a weapon would be found does not undermine our characterization of the intrusion as a valid Terry frisk.

In a last-ditch stand, the appellant contends that the Terry doctrine lacks force within the home because of the heightened expectations of privacy that operate in that domain. To support this contention, he leans upon the dissenting opinion in United States v. Beaudoin, 362 F.3d 60, 71 (1st Cir. 2004) (Lipez, J., dissenting). A dissenting opinion is, of course, not binding precedent, and the majority opinion in Beaudoin, which is controlling on this panel, applied Terry in the quasi-residential setting involved there (a doorway of a hotel room). See United States v. Beaudoin, 362 F.3d 60, 67-68 (1st Cir.) (en banc), cert. denied, 125 S. Ct. 484 (2004) [No. 04-5440].

-23-

In all events, the Beaudoin dissent focused on the validity of the initial seizure of the defendant. See id. at 76-77 (Lipez, J., dissenting). It did not directly address the multifaceted question of whether and in what circumstances a security frisk is permissible where, as in this case, an officer legitimately secures consent to enter residential premises. Fairly read, then, the Beaudoin dissent does not commit to a per se rule that would prevent the Terry doctrine from crossing the threshold into the home.

Beaudoin aside, the appellant's argument cannot withstand scrutiny. In Terry, the Supreme Court recognized the need to reconcile an individual's Fourth Amendment right against unreasonable personal invasions with the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." Terry, 392 U.S. at 23. The appellant argues, in effect, that because the Terry Court dealt with "the myriad daily situations in which policemen and citizens confront each other on the street," id. at 12 (emphasis supplied), this court should limit its logic to such public encounters and should not extend that logic to protective actions taken in the course of legitimate investigative activities (including emergency responses to 911 calls) that bring police within the sanctuary of a person's home. This argument is

misguided. It invites us to disregard entirely one side of the balance that _Terry_ struck (the serious concern for officer safety) simply because the interest on the other side (the right to be secure against intrusions in the home) deserves heightened protection.

We decline this invitation. We find no support for the proposition that the in-home setting automatically eclipses any and all interests in officer safety. To the contrary, in deciding whether a requirement less demanding than probable cause can justify certain police activities involving the home, the Court has emphasized that "there is 'no ready test for determining reasonableness,'" _Maryland_ v. _Buie_, 494 U.S. 325, 332 (1990) (quoting _Terry_, 392 U.S. at 21), and has balanced the nature of the intrusion against the contextualized concern for officer safety, _see_ _id._ at 332-34 (holding that the heightened risk of jeopardy to the police in the context of an in-home arrest outweighed the intrusion entailed in a protective sweep of the premises for dangerous individuals). In much the same vein, the Court recently reemphasized that "for the most part _per_ _se_ rules are inappropriate in the Fourth Amendment context." _United States_ v. _Drayton_, 536 U.S. 194, 201 (2002). The appropriate inquiry, as we have said, entails a consideration of the totality of the circumstances surrounding an encounter. _Id._

In applying the Terry doctrine to areas in and around the home, our case law has followed these principles, eschewing bright-line rules and treating the residential nature of the premises as part of the totality of the circumstances in determining whether reasonable suspicion justified particular police actions. See, e.g., United States v. Moore, 235 F.3d 700, 702-04 (1st Cir. 2000) (sustaining a Terry stop and frisk of a person detained in a second-floor internal stairwell upon his egress from a third-floor apartment); Campa, 234 F.3d at 736-38 (upholding a Terry stop and frisk of a defendant apprehended inside an apartment and moved into the hallway). Other courts have held, as we do today, that once an officer is legitimately on residential premises pursuant to consent or other lawful authority, individualized suspicion that a person is armed may justify a frisk. See United States v. Brooks, 2 F.3d 838, 842 (8th Cir. 1993) ("Following a consensual or otherwise lawful entry into a private dwelling, police can pat a suspect down for weapons if they have a reasonable, particularized suspicion that the suspect is armed."); United States. v. Flippin, 924 F.2d 163, 165-66 (9th Cir. 1991) (similar).

The most natural reading of Terry suggests that its rationale is designed to address the need for officer safety in the course of all legitimate investigative activities. We have been faithful to the core principle of Terry here by requiring individualized suspicion and accounting for the totality of the

-26-

circumstances that enter into the delicate balance posed by constitutional and practical concerns.[3]

## IV. CONCLUSION

We need go no further. The record in this case supports the conclusion that the officers entered the premises with the consent of the principal occupant. Similarly, it supports the conclusion that the totality of the circumstances gave rise to a reasonable, articulable suspicion sufficient to justify the ensuing detention and frisk.[4] Accordingly, we uphold the district court's denial of the motion to suppress.

**Affirmed**.

---

[3]This case-specific approach means, of course, that our opinion is duly limited to the circumstances of this case. Just as we decline to adopt a per se rule banning the Terry doctrine from residential settings, we similarly decline any rule-like suggestion that Terry's requirement of particularized suspicion is in any way diminished within the home simply because an officer legitimately enters upon its premises. Cf. Ybarra v. Illinois, 444 U.S. 85, 94 (1979) (holding that the authority to search commercial premises does not include the authority to frisk all patrons of the establishment for weapons absent "reasonable belief or suspicion directed at the person to be frisked").

[4]Given our resolution of these issues, we have no occasion to inquire whether probable cause, exigent circumstances, and/or the emergency doctrine provided additional justification for the officers' actions.