GREGORY, Circuit Judge,
dissenting:
The majority opinion brings the Fourth Amendment two steps closer to a death by a thousand cuts. Today’s decision leaves us teetering on the brink of a per se rule that any face-to-face dialogue between the *155 police and an informant, however scant, is sufficient to create the reasonable suspicion necessary for a Terry stop in a “man with a gun” case. It then gives expansive meaning to Michigan v. Long’s limited authorization for conducting vehicle searches in connection with a Terry stop. Because I believe that today’s decision relies on an overbroad reading of this Court’s precedent and contravenes the spirit, if not the letter, of Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), I respectfully dissent.
I.
When officers reported to the Value Lodge Motel on September 28, 2005, they knew only that an anonymous tipster had called 911 from that location to report “a man with a gun.” (J.A. 55.) Officer Clifton testified at the suppression hearing that she was the first to arrive on the scene and that she proceeded to the second-floor room number noted by the police dispatchers and spoke with someone in that room (“the informant”). She did not inquire whether the informant was the person who had placed the anonymous 911 call, and she could not even recall whether the informant was a man or a woman. (J.A. 60.)
The testimony of Officer Carey, the next officer to arrive on the scene, does little more to clarify Officer Clifton’s admittedly vague recollections of the informant. At one point in his testimony, Officer Carey did refer to the informant as “the gentleman with whom we were speaking.” (J.A. 25.) However, the reliability of this gender identification is highly questionable given that Officer Carey later indicated that he could not recall whether he ever spoke with the informant and that he had “no knowledge about this person [the informant].” (J.A. 38.) In fact, Officer Clifton testified that Officer Carey remained on the ground floor level at all times that she was upstairs speaking with the informant.[1]
At some point, the nameless, gender-less informant pointed to a vehicle in the motel parking lot and said “That’s the ear; that’s him inside.” (J.A. 61.) The informant provided no additional identifying information about the man in the car, and the officers had no independent information about him. Nonetheless, the officers believed this sufficed to create a reasonable suspicion to conduct a Terry stop and pat-down of Mr. Griffin. The district court and now the panel majority have agreed.
The majority reasons that because Officer Clifton met face to face with the informant, the information gleaned from that encounter was not an anonymous tip that would require additional “indicia of reliability” in order to provide the basis for a Terry stop, J.L., 529 U.S. at 270, 120 S.Ct. 1375. Face-to-face encounters are undeniably more reliable as a general matter than purely anonymous tips. See United States v. Christmas, 222 F.3d 141, 144 (4th Cir.2000). But neither this Court nor the Supreme Court has ever created a rule that an encounter between a police officer and an informant is a per se reliable basis for creating reasonable suspicion simply because that encounter occurred face-to-face. This case illustrates precisely why such a rule would be improper.
The Supreme Court’s concern with the anonymous tip at issue in J.L. was that “[a]ll the police had to go on ... was the bare report of an unknown, unaccountable informant who neither explained how he *156 knew about the gun nor supplied any basis for believing he had inside information.” 529 U.S. at 271, 120 S.Ct. 1375. In Christmas, we were able to distinguish J.L. because, by obtaining their tip in a face-to-face encounter with the informant, the Christmas officers were able to assess the informant’s credibility and were in a position to hold the informant accountable for any false statements she might have made. 222 F.3d at 144.
Here, the face-to-face encounter had none of the indicia of reliability that normally inhere in such circumstances. In fact, this encounter may as well have been a purely anonymous one. Neither Officer Clifton nor Officer Carey could provide any reliable identifying information about the informant — no name, no gender. Neither officer could say what the informant’s basis for his or her knowledge was. While the informant may have been “in close proximity to Griffin’s vehicle when he spoke with Officer Clifton” (Maj. Op. at 153), it does not appear that the informant ever stated that he or she personally saw the defendant with a gun. In short, this face-to-face encounter did not result in anything even close to the kind of assessment of “credibility and demeanor” that occurred in Christmas. 222 F.3d at 144.
The majority dismisses Griffin’s arguments about the accountability of the informant because, in their view, the officers could always return to the motel room where the informant was originally found. (Maj. Op. at 152-53.) But the path to accountability that the majority sketches is clearly more tenuous than that in Christmas. Unlike in Christmas where the informant was an unnamed neighbor of the defendant, 222 F.3d at 143, the informant here was but a transient motel guest. While we know little about the personal circumstances of the informant — how long he or she had been at the motel or how long he or she planned to stay — he or she certainly could pack up and leave a motel room much more easily than one could a home. Any suggestion that the informant could easily be held accountable is further undermined by the fact that the police had no idea what the informant looked like. Cf. United States v. Valentine, 232 F.3d 350, 355 (3d Cir.2000) (“[T]he officers could assess the informant’s credibility as he spoke, knew what the informant looked like, and had some opportunity to find the informant if the tip did not pan out.”).
As a result, I find the majority’s blithe comparisons of this case to Christmas and similar cases in other circuits alarming. This case does not fall in squarely with these other precedents; at best, it strains their outer boundaries. In Christmas, officers investigating a homicide were approached by a neighborhood resident, who gave her address and reported that drugs were being dealt at the home two doors down from her. 222 F.3d at 143. The police proceeded to that home and observed a group of people on the porch, one of whom — the defendant — was recognized as a gang member from another part of town. Id. at 143, 145. This independent recognition and awareness of the defendant provided sufficient indicia of the reliability of the informant’s tip because the officers could reasonably surmise that Christmas’ presence on the porch was odd and “created a potential for violence.” Id. at 145. Here, the officers knew nothing about the informant except that he or she was found in the same motel room from which the 911 call was placed and they had no independent information about the defendant to support the informant’s tip.
The officers in United States v. Romain, 393 F.3d 63 (1st Cir.2004), similarly had much more than a tip from an unknown informant to justify their pat-down of the defendant. Officers responded to a 911 *157 call in which a woman, who sounded as if she were in danger, told the emergency operator that there was a man with a gun at her location. Id. at 66. When they arrived, two women answered the door, and one nodded affirmatively when asked if there was someone in the apartment with a gun. Id. When officers entered, the defendant emerged from a bedroom acting aggravated, flailing his arms and shouting, and moved threateningly towards one of the officers. Id. After seizing the defendant and placing him against the wall, one of the officers spoke with the woman who had indicated there was a gun in the apartment and asked if she had placed the 911 call. Id. at 66-67. She admitted to being the caller and told the officers that the gun was in the defendant’s waistband. Id. Only then did officers conduct a pat-down. Id.; cf. United States v. Heard, 367 F.3d 1275 (11th Cir.2004) (finding reasonable suspicion for stop and frisk after officer observed and helped to end public dispute between defendant and unknown informant who left before she could be questioned); Valentine, 232 F.3d at 352, 357 (finding reasonable suspicion for stop and frisk where officers first obtained detailed description from unknown informant with personal knowledge and then observed defendant acting evasively).
In each of these cases, officers had an opportunity to observe the credibility and demeanor of an informant in a face-to-face dialogue — and they actually took advantage of that opportunity. More importantly, in each of these cases, the officers made independent observations that corroborated the suspicions raised by the informants. This is a far cry from the facts before us in this appeal. I take no issue with the majority’s well-supported point that face-to-face dialogues generally result in a very different species of tip than that offered by a purely anonymous informant. But, even if nine out of ten face-to-face encounters with an informant provide the necessary indicia of reliability to create a reasonable suspicion, this case is plainly the unreliable tenth. Officers Clifton and Carey had no independent information to corroborate the unidentified informant’s incriminating statements against Griffin and they cannot plausibly be said to have assessed the informant’s credibility and demeanor, such that the tip itself might suffice to provide a reasonable suspicion. Thus, though perhaps technically not an “anonymous tip” case, this case is much closer to J.L. in its facts than it is to either Christmas or Romain.
The majority’s efforts to square this case with Christmas seem motivated, at least in part, by their concerns about the ramifications of “a contrary holding.” (Maj. Op. at 153 n. 4.) Undoubtedly, “man with a gun” tips put officers in an especially dangerous position that might “sometimes justify unusual precautions.” J.L., 529 U.S. at 272, 120 S.Ct. 1375. Yet, the Supreme Court has already considered and rejected the idea that “an automatic firearm exception to our established reliability analysis” is warranted. Id.
The majority’s opinion comes dangerously close to flouting this and creating a per se rule of reliability for face-to-face dialogues with informants in “man with a gun” cases. With this case as precedent, an officer provided with a “man with a gun” tip in a high-crime area by an unknown, unaccountable informant may now, without any other indicia of reliability, conduct a Terry stop. This clearly undermines at least the spirit of J.L., and it relies on an overbroad reading of our precedent in Christmas. In fact, this decision “enable[s] any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by ... falsely reporting the *158 target’s unlawful carriage of a gun.” J.L., 529 U.S. at 272, 120 S.Ct. 1375.
II.
Even assuming the Terry stop and accompanying pat-down were proper, it is undisputed that they yielded no evidence of criminal conduct on the part of Mr. Griffin. Nonetheless, Officer Carey decided to handcuff Griffin and place him in the back of a patrol car. He then instructed Officer Clifton to search Griffin’s vehicle. The majority finds this vehicle search to be proper under Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).
Long imposes a two-part test for vehicle searches pursuant to a Terry stop: an officer must have a “reasonable belief’ that (1) “the suspect is dangerous,” and (2) “the suspect may gain immediate control of weapons.” Id. at 1049, 103 S.Ct. 3469. On this first requirement, the majority points to three factors that it feels support the officer’s search: first, the officers received a face-to-face tip that Griffin had a gun; next, the defendant was in a “high crime area;” and, finally, Griffin acted evasive during the pat-down. However, none of these suffice, alone or taken together, to create a reasonable belief that Griffin was dangerous.
Standing as a hallmark of our investigatory stop jurisprudence is the principle that such stops are only justified where officers have a “reasonable, individualized suspicion” of criminal activity before a frisk or protective search takes place. Maryland v. Buie, 494 U.S. 325, 334 n. 2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (emphasis added). So, while “the fact that [a] stop occurred in a ‘high crime area’ [is] among the relevant contextual considerations,” Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quoting Adams v. Williams, 407 U.S. 143, 144, 147-48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)), it cannot be an endpoint for a Terry or Long analysis. Otherwise, we relegate those unfortunate enough to have to live in such “high crime areas” to second-class citizenship for purposes of the Fourth Amendment.
Whatever individualized suspicion of Griffin’s dangerous-ness the officers could have had, it had to rest on the information provided by the informant and on Griffin’s conduct during the Terry pat-down. At the risk of beating a dead horse, I must emphasize again the flimsiness of the informant’s tip. The only information the informant gave to implicate Griffin was his or her statement, “That’s the ear; that’s him inside.” (J.A. 61.) The informant gave no indication about the basis of his or her knowledge, and the officers themselves had failed to confirm that the informant was the same person who placed the 911 call. The informant’s statement might have been more of a “smoking gun” if, as in most face-to-face encounters, the officers had actually taken the opportunity to assess the informant’s credibility and demeanor. Instead, the officers could tell the district court virtually nothing about the source of their information — not even the person’s gender. As for Griffin’s so-called “evasive” behavior (Maj. Op. at 153-54), this occurred not prior to the Terry stop, but during the patdown, and it consisted simply of his “turning around” (J.A. 27), a reaction that seems a natural and instinctive response to being frisked by a police officer.[2]
Not one of the factors cited by the majority could by itself support a finding that *159 Griffin was a danger of the kind needed to justify a protective search of his vehicle. In combination, these factors fare no better. The majority once again finds that the search rests comfortably within the boundaries of our precedent, specifically United States v. Elston, 479 F.3d 314 (4th Cir.2007) and United States v. Holmes, 376 F.3d 270 (4th Cir.2004). But, in fact, both cases are readily and significantly distinguishable. In Holmes, we found that officers could reasonably believe that the defendant was dangerous given their particularized suspicion that he was a gang member who had previously been involved in a number of armed, violent felonies. 376 F.3d at 277. In Elston, a Long search was upheld where a named informant provided a 911 operator with a detailed description of the defendant, who had left her home in his truck, highly intoxicated and with a loaded handgun and extra ammunition that he had threatened to “let[ ] ... off in somebody.” 479 F.3d at 315 (alteration in original). The factual dissimilarities between Holmes and Elston on the one hand and this case on the other are patent enough that I need not linger on them.
A closer factual analogue in many ways comes from our decision in United States v. Neely, 564 F.3d 346 (4th Cir.2009). In Neely, we found that acting nervous and stumbling, even in a high crime area, was not enough to create a reasonable belief that the defendant posed the kind of danger needed to justify a search under Long. Id. at 351-52. The Neely panel admittedly termed it a “close case” and suggested that “several facts present here, under different circumstances, might counsel a different result.” Id. at 352. But the only evidence here that might suggest circumstances different from those present in Neely is the informant’s incriminating, but limited and wholly unreliable, tip. Thus, a reasoned application of our precedent leads to the conclusion that, as in Neely, this search was not protected by Long.[3]
III.
Today’s decision effectively holds that anytime someone provides officers with a face-to-face “man with a gun” tip, at least in a “high crime area,” the officer has been given both a sufficiently reasonable suspicion of criminal activity to justify a Terry stop and a sufficiently reasonable belief of the suspect’s dangerousness to justify a protective search under Long. This troubling result is cleverly cloaked in over-broad readings of this Court’s precedent— Christmas, Holmes, and Elston — but it plainly undermines the Supreme Court’s decision in J.L. A fair reading of the case law shows that Griffin’s motion to suppress should have been granted on both grounds, and I therefore dissent.

. The district court also acknowledged these inconsistencies in Officer Carey’s testimony. (See J.A. 71-72.)

. The majority further factors in its Long analysis the fact that some onlookers, including someone who may have known Griffin (Maj. Op. at 154 n. 5), were present at the scene of the Terry stop. The district court relied heavily on this reasoning to justify its ruling on the protective search, and the government has urged us also to consider this *159 factor. Yet, neither the district court, the government, nor the majority cites any law to support the proposition that concerns about danger from people other than the suspect, and who have no clear connection to the suspect, can justify a protective search of the suspect’s vehicle. Long itself takes the position that officers must have a reasonable belief "that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. at 1049, 103 S.Ct. 3469 (emphasis added).

. Having concluded that the first prong of the Long analysis is not met, it is not necessary to decide whether an officer had a "reasonable belief” that "the suspect may gain immediate control of weapons.” Long, 463 U.S. at 1049, 103 S.Ct. 3469. While the majority’s dismissive view of the implications of Arizona v. Gant, - U.S. -, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) on today’s case gives me pause, I do agree that the Court in Gant did not decide the issues now before us.